MODIFIED

No. 110,645

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

JOSE FERNANDEZ-TORRES,
*Appellee*.


SYLLABUS BY THE COURT

1.

To assess the voluntariness of a defendant's statements to government agents, the district court considers all of the facts bearing on the interaction leading up to and resulting in those communications. The ultimate issue is whether the statements reflect the product of a free and independent will, *i.e.*, did the individual act voluntarily? The district court must examine the totality of the circumstances surrounding the making of the statements.


2.

A government agent may induce an involuntary statement through improper threats of harm, promises of benefit, a combination of the two, or other undue influence over the suspect.


3.

The State must prove the voluntariness of a defendant's statements by a preponderance of the evidence.

4.

A court must determine the voluntariness of a defendant's statement without regard to its truth or falsity because the determination implicates due process rights and the protection against self-incrimination.

5.

Under K.S.A. 2013 Supp. 60-460(f), an out-of-court statement of the accused offered by the government in a criminal prosecution will be treated as inadmissible hearsay unless: (1) the statement was knowingly and understandingly made in the absence of threats or coercion rendering it involuntary and (2) the statement was made in the absence of threats or promises by a public official that would likely induce a false admission.

6.

Under the facts of this case, the district court correctly suppressed the defendant's statements to law enforcement officers as involuntary when the record showed the principal questioner lied about biological evidence implicating the defendant and misled the defendant about the legal consequences of admitting to certain inculpatory conduct, especially in combination with defendant's low to average intellectual capacity and the subpar English-Spanish translation made during the interrogation.

Appeal from Douglas District Court; PEGGY C. KITTEL, judge. Original opinion filed September 26, 2014; modified opinion filed October 24, 2014. Affirmed.

*Mark A. Simpson*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Branden A. Bell* and *Sarah G. Hess*, of Brown & Ruprecht, PC, of Kansas City, Missouri, for appellee.

2

Before LEBEN, P.J., ATCHESON and SCHROEDER, JJ.

ATCHESON, J.: The State has sought interlocutory review of an order of the Douglas County District Court suppressing inculpatory statements Defendant Jose Fernandez-Torres made to a police officer questioning him about improper physical contact he may have had with his girlfriend's young daughter. The district court found the circumstances of the interrogation rendered the statements involuntary, including problems with the Spanish-language translation, the officer's false representations about evidence supposedly implicating Fernandez, and the officer's poorly translated suggestion that some sort of momentary though improper touching of the girl could be dealt with. The record evidence supports the district court's factual findings, and we see no error in the legal determination to suppress the statements. We, therefore, affirm the district court's order.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In September 2010, the Douglas County District Attorney charged Fernandez with aggravated indecent liberties with a child for the lewd touching of A.L.G., who was 7 years old at the time. The offense was then codified in K.S.A. 2010 Supp. 21-3504 and carried a life sentence with no parole eligibility for 25 years, as provided in K.S.A. 2010 Supp. 21-4643(a)(1)(C).

During the investigation of the offense, Fernandez accompanied Lawrence police officer Anthony Brixius to the law enforcement center to be questioned about his interaction with A.L.G. Brixius had been a police officer for about 7 years and then worked as a plainclothes investigator primarily assigned to juvenile sex crimes. Fernandez was 23 years old and had moved with his family from Mexico to the United States about 8 years earlier. Fernandez attended school in Mexico until he was 14 years old. He speaks Spanish and apparently reads with some limitations. He cannot read

3

English but speaks the language conversationally. In 2010, Fernandez worked as a waiter at a Mexican restaurant.

At the suppression hearing, Brixius testified that he and Fernandez talked in English on the ride to the law enforcement center. Brixius speaks very little Spanish. Another police officer accompanied them. No one spoke in Spanish during the brief trip. Once at the law enforcement center, Fernandez was placed in an interrogation room. Brixius testified that he had concerns about Fernandez' fluency in English and sought out a Spanish-speaking translator to participate in the interrogation. Brixius pressed Oscar Marino, a bilingual probation officer, into service. Marino was born in Venezuela and grew up speaking Spanish; he came to the United States in his teens about 30 years ago and has become fluent in English. Marino has no training in real-time translation and has never been certified as a Spanish-English translator. At the suppression hearing, Marino testified that he has translated for police officers conducting interviews or interrogations "[a] handful" of times. The interrogation was videotaped.

Fernandez does not contend he was actually or functionally under arrest or physically restrained during the 2-hour interrogation. By all accounts, he voluntarily accompanied Brixius to the law enforcement center. Fernandez was not handcuffed during the car ride or at the law enforcement center. During the interrogation, Fernandez placed and completed a couple of calls on his cell phone.

After getting general background information from Fernandez in English, Brixius relied on Marino to translate as he informed Fernandez of his *Miranda* rights and secured a waiver of them. Although the exchange is hardly a model of clarity or sound police procedure based on the translation, the district court found a valid *Miranda* waiver, a point Fernandez does not dispute on appeal. The evidence fairly suggests the interrogation was not custodial, so an imperfectly rendered waiver would have no material legal consequences. See *J.D.B. v. North Carolina*, 564 U.S. ___, 131 S. Ct.

4

2394, 2401-02, 180 L. Ed. 2d 310 (2011); *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012); *State v. Morton*, 286 Kan. 632, 646-47, 649, 186 P.3d 785 (2008). But see *State v. Bridges*, 297 Kan. 989, 1010-11, 306 P.3d 244 (2013) (noting a split of case authority on whether reading of *Miranda* warnings amounts to a circumstance leading a reasonable person to consider police questioning custodial).

The remainder of the interrogation was conducted with Marino translating except for a few, limited exchanges.

At the suppression hearing, the State called Isabel Ferrandis-Edwards, a court certified translator, as an expert witness on the quality of Marino's translation during Brixius' questioning of Fernandez. Fernandez called Sara Gardner, also a court certified translator, for the same purpose. Both experts agreed that Marino sometimes translated incompletely or inaccurately the questions Brixius posed and the answers Fernandez gave. In a few instances, he asked his own questions of Fernandez.

At the start of the interrogation, Brixius questioned Fernandez generally about his relationship with A.L.G., A.L.G.'s mother, and A.L.G.'s younger half-brothers and the sort of things he did around the house and with the children. Fernandez is the natural father of the boys but not of A.L.G. Brixius then began more pointedly asking Fernandez about touching A.L.G.'s pubic area or vagina with his hand. During the bulk of the interrogation, Fernandez denied touching A.L.G. inappropriately. Fernandez told Brixius that he occasionally checked on the children while they were sleeping. He recalled recently pulling the covers back over his son. He then noticed A.L.G. was very close to the edge of her bed and seemed on the verge of falling. Fernandez said he grabbed A.L.G. and slid her back into bed. He said he could have inadvertently brushed his hand against A.L.G.'s pubic area, but he didn't think that happened.

Later in the interrogation, Brixius falsely told Fernandez that a doctor had found Fernandez' skin cells on A.L.G.'s vagina. Brixius then informed Fernandez the medical examination of A.L.G. meant he had touched her for a minute or two. Brixius began insisting that he knew Fernandez had inappropriately touched A.L.G. But he said he also knew Fernandez was not a bad person and "what happened, in part, was a mistake." Brixius then told Fernandez that if he had the intention of touching A.L.G. "just for a second . . . that's okay and we can deal with that because you didn't do more." In translating that statement, Marino used the Spanish word "negociar" for "deal with."

At the suppression hearing, both experts on translation questioned Marino's choice in phrasing the Spanish because "negociar" conveys a sense of negotiating or doing business. Ferrandis-Edwards, the State's expert, testified that in context, negociar "[d]efinitely is not the best choice." Gardner, Fernandez' expert, agreed that "negociar" commonly referred to business transactions and suggested a negotiated exchange. She, too, thought it inappropriately used and could convey the idea that Brixius would negotiate some arrangement with Fernandez if he admitted touching A.L.G. As we have said, the experts also agreed that Marino frequently failed to translate fully or entirely accurately questions and answers, inhibiting precise communication between Brixius and Fernandez.

Brixius continued to say he knew Fernandez had inappropriately touched A.L.G. and simply wanted to know why it happened. Fernandez responded he didn't know why. That sort of refrain recurred during the later stages of the interrogation. Several times during the interrogation, Brixius assured Fernandez that because he touched A.L.G.'s vagina only once he was a good person who had a momentary lapse in judgment rather than a child molester. At one point, Brixius suggested that Fernandez had too much to drink as a reason. Fernandez replied: "I am confused, because that had never happened and I don't know." Still later in the questioning, Brixius told Fernandez that "to touch her vagina, you had to have moved your hand there on purpose." But he quickly added, "And

6

it's ok because you didn't keep on touching her." Fernandez answered: "No, and with that, how I continued to touch her, that is why I am confused, because that had never happened." Brixius, however, continued to disregard those denials. Brixius then asked Fernandez when he realized what he had done was wrong. Fernandez said he realized it when he brushed his teeth a little while later. Asked again if that was when he realized he had done something wrong, Fernandez told Brixius, "Yes, kind of." But still later in the interview, Fernandez specifically denied touching A.L.G.'s vagina.

Brixius persisted in assuming Fernandez had touched A.L.G.'s pubic area and continued to press for an explanation. Toward the end of the interrogation, Brixius asked Fernandez, "Why [do] you think . . . you had a lapse in judgment and put your hand on her crotch?" Marino translated this question as, "Why do you think you had . . . that problem?" Fernandez replied, "I don't know why, because like I told you, maybe it was because I had been drinking . . . ." Brixius later asked why, at the start of the questioning, Fernandez hadn't admitted to touching A.L.G. Fernandez said he thought "it was an accident." Finally, Brixius asked, "But you knew that it had been done on purpose for [a] second because you felt bad about it afterwards?" Marino translated the question as: "So you think, you know that you did it on purpose[?]" Fernandez answered, "For a second[,] yes."

At the end of the interrogation, Brixius arrested Fernandez.[1]

[1]The interrogation lasted about 2 hours and contains considerably more detail than we have recounted here. We have relied, in part, on a translation and transcription of the interrogation that Ferrandis-Edwards reviewed and edited. The district court admitted the document as an exhibit at the suppression hearing. The 64-page document includes the translations Marino made during the interrogation and what Ferrandis-Edwards considered to be appropriate translations of what was actually said. Unless we have indicated otherwise, we have quoted the English translations of what Marino said to Fernandez in Spanish and the English translations Marino attributed to Fernandez.

7

At the suppression hearing, Brixius, Marino, and the expert translators testified. Fernandez did not. The district court also considered the testimony and report of Dr. Robert Barnett, a clinical psychologist, originally admitted during an earlier hearing in the case on a different issue. Based on a clinical examination, Dr. Barnett testified at the earlier hearing that Fernandez had "mild cognitive difficulty" that impaired his ability to fully understand and respond to questions during the psychological testing. Dr. Barnett also suspected Fernandez had a learning disability. In his report, Dr. Barnett characterized Fernandez as "functioning [intellectually] in the low average range." The parties do not challenge the district court's consideration of Dr. Barnett's evidence.

After the hearing, the district court issued a detailed memorandum decision granting Fernandez' motion and suppressing the statements he made to Brixius during the interrogation. The district court found that the full circumstances of the interrogation demonstrated that Fernandez' inculpatory statements were not the product of his free and independent will. The State has exercised its prerogative under K.S.A. 2013 Supp. 22-3603 to take an interlocutory appeal from a district court ruling suppressing a defendant's statements.

## II. ANALYSIS

*Standard of Review and Legal Test for Voluntariness*

To assess the voluntariness of a defendant's statements to government agents, the district court considers all of the facts bearing on the interaction leading up to and resulting in those communications. The ultimate issue is whether the statements reflect the product of a free and independent will, *i.e.*, did the individual act voluntarily? See *State v. Gilliland*, 294 Kan. 519, Syl. ¶¶ 3, 4, 276 P.3d 165 (2012); *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010); *State v. Shumway*, 30 Kan. App. 2d 836, 841-42, 50 P.3d 89, *rev. denied* 274 Kan. 1117 (2002). In short, the district court must examine the

8

totality of the circumstances surrounding the making of the statements. Among the factors to be considered in assessing voluntariness are: "(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *Gilliland*, 294 Kan. 519, Syl. ¶ 3; see *Stone*, 291 Kan. at 21. A government agent may induce an involuntary statement through improper threats of harm, promises of benefit, a combination of the two, or other undue influence over the suspect. *Hutto v. Ross*, 429 U.S. 28, 30, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976); *State v. Brown*, 286 Kan. 170, 174, 182 P.3d 1205 (2008). The State must prove the voluntariness of the defendant's statements by a preponderance of the evidence. *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013).

Voluntariness ultimately must be determined holistically. So a consideration or factor favoring the State does not directly negate another one favoring the defendant and vice versa—the outcome does not depend on a tally of factors for each side. Each relevant factor, likewise, should not be assessed in isolation. The collective effect of the circumstances drives the assessment. See *Randolph*, 297 Kan. at 326; *Stone*, 291 Kan. at 25.

An appellate court reviews the district court ruling using the well-known bifurcated standard under which factual findings must be supported by substantial evidence but the controlling legal conclusion is subject to unlimited review. An appellate court may not reweigh the evidence generally or make independent credibility determinations. *Gilliland*, 294 Kan. 519, Syl. ¶ 1; *Stone*, 291 Kan. at 21.

*The Rights at Stake*

A practical vice of an involuntary confession or admission is its inherent unreliability. *Jackson v. Denno*, 378 U.S. 368, 385-86, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964) (noting the "probable unreliability" of involuntary confessions). A statement given under physical or mental duress or in exchange for the promise of a substantial benefit necessarily comes with a questionable provenance. See *Dickerson v. United States*, 530 U.S. 428, 432-33, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). If the statement is a criminal defendant's own and the pressure brought to bear by government agents is sufficient to show involuntariness, the circumstances contravene the individual's due process rights and the protection against self-incrimination guaranteed through the Fifth and Fourteenth Amendments to the United States Constitution. *Kansas v. Ventris*, 556 U.S. 586, 590, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009); *Dickerson*, 530 U.S. at 433; *State v. Schultz*, 289 Kan. 334, 342-43, 212 P.3d 150 (2009). As a remedy, courts prohibit the government from using the statement against the defendant in any criminal prosecution. *Dickerson*, 530 U.S. at 433-34; *Stone*, 291 Kan. at 32-33; *Morton*, 286 Kan. at 649.

Because of those constitutional considerations, a court must determine the voluntariness of a defendant's statement without regard to its truth or falsity. *Rogers v. Richmond*, 365 U.S. 534, 543-44, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961); *United States v. Preston*, 751 F.3d 1008, 1018 (9th Cir. 2014) (en banc); *Parker v. Allen*, 565 F.3d 1258, 1280 (11th Cir. 2009). The Framers of the United States Constitution intended due process rights and protections against self-incrimination to prohibit inquisitorial judicial proceedings in which defendants could be compelled to speak against their own interests. *Preston*, 751 F.3d at 1015. Inquisitions historically relied on physical torture or impressed punishment on the accused for refusing to speak—procedures the Framers considered fundamentally unfair. See *Michigan v. Tucker*, 417 U.S. 433, 440, 94 S. Ct.

10

2357, 41 L. Ed. 2d 182 (1974); *Malloy v. Hogan*, 378 U.S. 1, 7-8, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); *Rogers*, 365 U.S. at 540-41; *Preston*, 751 F.3d at 1015.

In addition to the constitutional provisions bearing on the use of a defendant's confession to government agents, the district court relied on the hearsay exception in K.S.A. 2013 Supp. 60-460(f) to bar admission of Fernandez' statements. Under the statute, an out-of-court statement of the accused offered by the government in a criminal prosecution will be treated as inadmissible hearsay unless the circumstances show the statement to have been knowingly and understandingly made in the absence of threats or coercion that would render it involuntary and in the absence of threats or promises by a public official that would likely induce a false admission. K.S.A. 2013 Supp. 60-460(f). In most cases, a statement found to be constitutionally involuntary would also be excluded under K.S.A. 2013 Supp. 60-460(f). But in at least a couple of respects, K.S.A. 2013 Supp. 60-460(f) applies more broadly than the constitutional protections. Under K.S.A. 2013 Supp. 60-460(f)(2)(B), a court may exclude a statement as hearsay if threats or promises from a public official related to the charged offense were "likely to cause the accused to make such a statement falsely." The apparent falsity of a statement is a relevant consideration favoring statutory exclusion. The district court relied on that subsection. In other situations, K.S.A. 2013 Supp. 60-460(f) excludes not only statements a criminal defendant has given to government agents but those made to private individuals, as well.

*Assessing Voluntariness in This Case*

In its written decision, the district court carefully addressed each of the six factors that have been outlined in the caselaw and looked at the totality of the circumstances, particularly as those circumstances bore on the enumerated factors. The district court's factual determinations have support in the record evidence. We review those factors in

11

assessing the district court's legal conclusion to suppress the statements Fernandez made to Brixius during the interrogation.

The factor bearing on a defendant's mental condition primarily looks at something that would impair the individual's ability to understand and respond to a law enforcement officer's questions. A diagnosable and uncontrolled mental illness, such as active schizophrenia or another condition causing detachment from reality, would fall in that category. Less dramatic and more transient circumstances could impact a defendant's mental condition—extreme intoxication or fatigue would be examples. Here, the district court found no particular indicators that Fernandez' mental condition contaminated the interrogation. As the district court pointed out, Fernandez appeared comparatively relaxed during the interrogation, and he made no complaints about being tired, uncomfortable, or otherwise in distress.

The district court similarly found nothing in the physical attributes of the interrogation—the surroundings and its duration—to be coercive. We put to one side Brixius' interrogation technique for consideration as part of the fairness of the law enforcement officers conducting the questioning, as did the district court. The various factors, however, are not wholly exclusive of each other. They tend to overlap, thus underscoring the appropriateness of a collective review of those factors and any other relevant circumstances.

In this case, as we have noted, Fernandez was neither told he was under arrest nor treated as an arrestee during the interrogation, with the exception of the reading of *Miranda* warnings. He was not handcuffed or restrained during the trip to the law enforcement center or during the questioning. During the interrogation, neither Brixius nor Marino raised his voice to Fernandez or engaged in physically intimidating conduct. The questioning was comparatively brief at about 2 hours, especially considering the translation of questions and answers necessarily extended the length of the examination.

12

Fernandez did not ask for a break in the interrogation to use the restroom or for some other reason. The district court found nothing coercive about those aspects of the interrogation.

A closely related factor considers the defendant's perceived ability to communicate with the outside world. Interrogation rooms, by design, tend to be cloistered, thereby imparting a sense of isolation that itself can be coercive. See *Berkemer v. McCarty*, 468 U.S. 420, 437-40, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (recognizing that a public traffic stop typically lacks the coercive atmosphere of a station house detention); *Smith v. Kansas Dept. of Revenue*, 291 Kan. 510, 516-18, 242 P.3d 1179 (2010) (citing *Berkemer* with favor). Commonly, courts consider whether the individual was free to leave or, more precisely, understood that he or she could leave. *Schultz*, 289 Kan. at 341 (whether interrogation custodial); *State v. Nguyen*, No. 96,430, 2008 WL 360635, at *6 (Kan. 2008) (unpublished opinion). That didn't come up in this case, since Fernandez didn't ask or attempt to leave. But Fernandez made a couple of cell phone calls while he was at the law enforcement center. The district court found that tended to dispel any notion that Fernandez would have felt cut off or intimidated by the environment.

In weighing Fernandez' age, intellect, and background, the district court relied, in part, on the clinical assessment of Dr. Barnett. Dr. Barnett's expert opinion that Fernandez functioned intellectually in the "low average" range and likely had some form of learning disability was unrebutted. Dr. Barnett also testified Fernandez had difficulty readily understanding and responding to questions posed to him. Again, that clinical observation went unchallenged in the sense the State offered no countering expert. The intellectual limitations Dr. Barnett suggested at least square with Fernandez' abbreviated education and his partial literacy, especially in English. The district court found Fernandez' intellect played a part in rendering his statements involuntary.

13

Although Fernandez did not overtly display difficulty in understanding Brixius' examination or give facially unresponsive answers indicating a lack of comprehension, the district court had substantial evidence to support that finding of fact. The State counters that Brixius could not have deliberately exploited any hidden intellectual deficiency Fernandez might have had. But that bears more on officer fairness, not the extent to which a defendant's intellectual capacity actually affected the voluntariness of any incriminating statements.

The district court was particularly troubled by the last two enumerated factors: the fairness of the interrogation and Fernandez' fluency in English. We share that concern. In this case, the two factors are closely related, so we discuss them together.

Fluency in English typically comes into play when a suspect is literate in some other language but is interrogated in English. See *State v. Rodarte*, No. 102,132, 2011 WL 1814709, at \*2 (Kan. App. 2011) (unpublished opinion). Illustrating the seamlessness of the generically labeled factors, fluency would also be implicated if a suspect knew only English but his or her mental incapacity substantially impaired his or her ability to communicate. That situation might also bear on mental condition and, possibly, intellect. This case presents a variant because Brixius sought out a translator, so the interrogation could be conducted in Spanish—Fernandez' primary language, although Fernandez understands some spoken English.

To be plain about it, Marino lacked the bilingual capacity and the training to function effectively as a translator in an extended interrogation about a sex crime against a child. The two experts agreed that Marino mistranslated both questions and answers and sometimes substantially paraphrased what was being said. The district court's expressed concern about whether Brixius and Fernandez were fully communicating in an effective way finds sufficient support in the record evidence.

14

The district court was particularly troubled by Marino's use of "negociar" in conveying Brixius' assertion that "we can deal with" the situation if Fernandez had touched A.L.G. inappropriately for just a second. Both experts considered the translation to be misleading and suggestive of an accommodation in which Brixius could handle or negotiate any offense if Fernandez admitted to briefly touching A.L.G.'s pubic area or vagina. As translated for Fernandez, the statement might be construed as a promise of lenient treatment or an outright deal, thereby affecting the truthfulness of any inculpatory admissions on the theory a suspect might falsely confess if he or she understood no charges or only minor charges would result. See *State v. Brown*, 285 Kan. 261, 276-77, 173 P.3d 612 (2007). The State contends the maladroit "negociar" was one word—a blip—in an extended interrogation and couldn't have induced Fernandez' admissions.

The emphasis Marino imparted with his use of "negociar" may not have been what Brixius specifically wanted or intended. But the deviation was one of degree given Brixius' interrogation technique that combined false representations about supposedly incriminating evidence with suggestions that inaccurately tended to minimize the legal consequences of some unlawful behavior. The result of those techniques over the course of the interrogation combined with communications issues resulting from subpar translation and Fernandez' limited intellectual capacity caused the district court to find the resulting statements to be involuntary and, thus, constitutionally suspect. Fernandez' limited fluency in English ties into the fairness of the interrogation. So we turn to that factor.

In the face of Fernandez' denials that he inappropriately touched A.L.G. and his limited admission that he might have accidently brushed her pubic area in trying to get her back into bed, Brixius falsely stated skin cell evidence conclusively proved otherwise. There was no such evidence. Brixius, however, insisted the phantom scientific evidence meant Fernandez intentionally touched A.L.G.'s vagina. Brixius then repeatedly challenged Fernandez to offer some explanation for that conduct. Brixius suggested

15

Fernandez wasn't a bad person and merely had a momentary lapse in judgment, perhaps because he was upset or had drunk too much or for some other reason, in contrast to being a degenerate regularly preying on children for sexual gratification. Brixius then told Fernandez if he had touched A.L.G. for a second, they could "deal with that"—the representation that Marino translated to "negociar." Later in the interrogation, Brixius again told Fernandez that it was "okay" because he didn't keep on touching A.L.G. Those representations falsely minimized the legal consequences of the action—brief, intentional physical contact with A.L.G.'s genitals actually would legally support a charge of aggravated indecent liberties with a child and a life sentence upon conviction.

Brixius' interrogation approach effectively informed Fernandez both that the police had irrefutable scientific evidence that he had touched A.L.G.'s vagina and that if he had done so only for a second his actions were "okay" and could be dealt with. The underlying message to Fernandez was this: We have overwhelming evidence against you, but if you tell us you did it just briefly, nothing much will happen to you. Brixius maneuvered Fernandez into a situation in which yielding to the suggestion would seem to carry a material benefit, though quite the reverse was true. An unwary or pliable subject—Fernandez, based on the district court's findings, fit that bill—could be induced to accede to the suggested version of events because it looked to be convenient, compliant, and advantageous. In that situation, a suspect may no longer be especially concerned about falsity of the statement. The interrogation strategy lures the subject in, snares him or her with representations about the strength of the evidence (that may or may not have any basis in fact), and then offers what appears to be a way out through admissions deliberately and incorrectly cast as significantly less legally and morally blameworthy than alternative explanations of the evidence.

Although Marino poorly translated some of the specific questions and answers and occasionally injected himself into the exchange between Brixius and Fernandez, his actions did not materially blunt the overall interrogation techniques. The key components

16

of Brixius' effort to enhance the inculpatory evidence and to minimize the consequences of an admission to certain conduct came through. Marino actually upped the impact of that effort with his maladroit translation suggesting Brixius could work out a deal with Fernandez.

In this case, looking at the whole of the circumstances, we conclude, as did the district court, that the inculpatory statements Fernandez made to Brixius were sufficiently tainted by the interrogation process and Fernandez' vulnerability to be something less than freely given. The State has failed to show they were the product of an independent will rather than of the false evidence and phony inducement implied by the interrogator. A statement rendered under those circumstances must be treated as constitutionally infirm and necessarily involuntary. Accordingly, the district court reached the right legal conclusion in excluding the interrogation of Fernandez as evidence against him in this case. The interrogation violated Fernandez' Fifth and Fourteenth Amendment rights.

We also agree with the district court that Fernandez' statements were inadmissible hearsay under K.S.A. 2013 Supp. 60-460(f)(2)(B). Based on the evidence at the suppression hearing, the district court could fairly conclude the inculpatory statements Fernandez made to Brixius were likely false. The State offered no evidence to the contrary at the hearing. The translation using "negociar" supports the district court's finding that Fernandez reasonably may have believed Brixius had the authority to act on any criminal charges in exchange for an admission of some degree of culpability, the other statutory requirement in K.S.A. 2013 Supp. 60-460(f)(2)(B).

*Analogous Case Authority—Old and New*

The conclusion we reach is consistent with the analysis the Kansas Supreme Court applied in *Stone* to find a confession involuntary. 291 Kan. at 32-33. Although the facts in *Stone* and here differ in some respects, as they commonly do across cases, the court

17

emphasized the importance of assessing all aspects of a police interrogation collectively in making a voluntariness determination. 291 Kan. at 29. Both cases involved the investigation and prosecution of sex offenses against young children. In that case, as here, the detective conducting the interrogation lied about having biological evidence establishing that Stone committed the offense. The detective questioning Stone combined those representations with a "tactic . . . minimizing the seriousness of the accusations" and suggesting that "only confessing could keep him out of jail or affect the length of his [sentence]." 291 Kan. at 29-30. The court concluded the overall impact of that method of interrogation "made the circumstances unduly coercive." 291 Kan. at 29.

In each case, the interrogation lasted roughly 2 hours. At the beginning of the interrogation, Stone told the detective he was quite tired and had a sore throat. During the questioning, Stone repeatedly mentioned being tired, something the court considered significant. 291 Kan. at 32. Here, although Fernandez appeared rested, the language barrier and his intellectual capacity affected the interrogation.

The court pointed out that Stone consistently denied any wrongdoing during the bulk of the interrogation and then eventually admitted to the minimized version of the offense the detective suggested. 291 Kan. at 29. The interrogation of Fernandez followed a similar pattern. Fernandez repeatedly said he did not touch A.L.G.'s vagina or otherwise act inappropriately. Confronted with Brixius' false representation that physical evidence disproved his denial and Brixius' suggestion that touching A.L.G. for only a second would be okay or could be dealt with, Fernandez admitted to that scenario. The analysis in *Stone* supports suppression in this case.

The State contends Fernandez confessed to touching A.L.G.'s pubic area, if only accidently, even before Brixius brought up the fictional skin cell evidence, meaning the interrogation techniques didn't make any difference. That may be too generous a reading of what Fernandez told Brixius during the first part of the interrogation. As we have

outlined, Fernandez denied he inappropriately touched A.L.G. But many of the questions and answers, as translated, focused on some kind of inadvertent touching. Fernandez conceded the hypothetical possibility he might have *accidently* brushed against A.L.G.'s pubic area and explained how that could have happened as he moved the child from the edge of the bed. In context, however, Fernandez' responses during that part of the questioning don't include an obvious admission that he actually touched A.L.G.'s pubic area at all. Even after Brixius had referred to the purported skin cell evidence, Fernandez continued to deny intentionally touching A.L.G.'s pubic area.

The State's argument remains unpersuasive on its own terms, accepting the premise that Fernandez admitted to an inadvertent or accidental touching of A.L.G.'s vagina. The State says the difference between an admitted inadvertent touching and an intentional touching isn't all that great. We disagree. During that stage of the interrogation, Brixius had not yet injected the idea that a brief, intentional touching was "okay" or could be dealt with—the technique of minimizing criminal consequences. So early in the interrogation, an accidental touching would have seemed excusable both morally and legally, while an intentional touching, entailing a degree of sexual gratification on Fernandez' part, would not. Only later in the interrogation did Brixius reframe the circumstances with the false representation of scientific evidence proving an intentional touching and the deceptive minimalization of the legal implications of some intentional touching. As part of a calculated strategy to coax Fernandez into admitting a serious crime, those very tactics diminished the apparent legal differences between an accidental touching and a brief, intentional touching. As the party bearing the burden of proof on the voluntariness of the admissions, the State cannot show that those techniques made no difference in this case.

More broadly, the State's premise is counterintuitive. The legal and moral gulf between inadvertent or negligent conduct, on the one hand, and intentional conduct, on the other, is hardly a mystery. For example, most people would say absentmindedly

19

failing to pay a bill is different from paying it with a check written on an empty account. And most people would recognize that accidentally hitting a pedestrian with a car is far less culpable than intentionally running someone down in a crosswalk. The difference between accidental and intentional here is similarly pronounced.

Judicial concern about the coercive impact of interrogation techniques of the sort used in *Stone* and here is neither isolated nor new. Nearly 50 years ago, the United States Supreme Court warned of the dangers lurking in government agents' use of psychologically debilitating interrogation techniques. *Miranda v. Arizona*, 384 U.S. 436, 448-49, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Those methods replaced physical brutality with a more insidious manipulation designed to extract inculpatory statements through mental coercion rather than the threat or infliction of bodily pain. But they may be no less repugnant to a suspect's constitutional rights. 384 U.S. at 448 ("'[T]his Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.'") (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S. Ct. 274, 4 L. Ed. 2d 242 [1960]).

The *Miranda* Court went on to describe a relatively new interrogation strategy being taught to law enforcement officers that largely parallels how Brixius questioned Fernandez. 384 U.S. at 449-50 (outlining technique developed and taught by Fred E. Inbau and John E. Reid). The officer first should isolate the suspect in unfamiliar surroundings, such as a police interrogation room. Then, the guilt of the suspect "is to be posited as a fact." The questioner should solicit reasons why the suspect might have committed the offense, such as a bad family life or having drunk too much. The technique then instructs the officer "to minimize the moral seriousness of the offense." The intended effect of the technique is "to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty." To complete the strategy, the questioner must dismiss and discourage any contrary explanation, *i.e.*, innocence. 384 U.S. at 450. This technique, often referred to as

20

the Reid method, remains widely used. See *United States v. Preston*, 751 F.3d 1008, 1023 n.19 (9th Cir. 2014) (en banc); Feld, *Behind Closed Doors: What Really Happens When Cops Question Kids*, 23 Cornell J.L. & Pub. Pol'y 395, 412-13 (Winter 2013) (describing the Reid technique as "the leading training program in the United States" and as "underl[ying] most contemporary interrogation practice").

Interrogation techniques of that sort may induce individuals to give necessarily false confessions to crimes they never committed, especially if they are guileless or otherwise particularly susceptible to external influences. Juveniles and the intellectually impaired, as groups, are vulnerable, since they tend to be trusting of authority figures and lack sophistication and discernment. *J.D.B. v. North Carolina*, 564 U.S. ___, 131 S. Ct. 2394, 2403-04, 180 L. Ed. 2d 310 (2011); *Preston*, 751 F.3d at 1022; see Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1064 & n.69 (2010); Kassin, *et al.*, *Police-Induced Confessions: Risk Factors and Recommendations*, 34 Law & Hum. Behav. 3, 30 (2010). The susceptibility to psychologically manipulative interrogation techniques may be more pronounced in individuals unfamiliar with the criminal justice process. Although innocent, an individual may attribute the purported evidence against him or her to a horrible and likely uncorrectable mistake rather than to the interrogator's deception. And the interrogator's categorical dismissal of each protest of innocence can cement that fear. The individual then considers the minimalized admission of guilt the interrogator has offered to be the best way out of an exceptionally bad predicament. See Kassin, 34 Law & Hum. Behav. at 14, 16-19; Gohara, *A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques*, 33 Fordham Urb. L.J. 791, 817-19 (2006); Ofshe & Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Denv. U.L. Rev. 979, 985-86 (1997).

In *Commonwealth v. DiGiambattista*, 442 Mass. 423, 428, 439-40, 813 N.E.2d 516 (2004), the Massachusetts Supreme Judicial Court held that the combined effects of law enforcement officers' false representation that a security video placed DiGiambattista

21

at the scene of a late night arson and of their suggestions that the offense was "understandable" and called for counseling rendered his confession involuntary. The court recognized either technique standing alone typically would not undermine a confession but together they easily could. 442 Mass. at 433, 438-39. Even so, the court found the individual tactics troubling. As the court observed: "If a suspect is told that he appears on a surveillance tape, or that his fingerprints or DNA have been found, even an innocent person would perceive that he or she is in grave danger of wrongful prosecution and erroneous conviction." 442 Mass. at 434-35. And "such 'minimization' of the crime by an interrogator implies leniency if the suspect will adopt that minimized version of the crime, and that leniency can thereby be implicitly offered even if it is not expressly stated as a quid pro quo for the confession." 442 Mass. at 436. Although Massachusetts requires the State to prove voluntariness beyond a reasonable doubt, a higher standard than in Kansas, the corrosive effects of the interrogation techniques are the same. The Utah Supreme Court voiced similar concerns about those tactics resulting in overbearing and impermissibly coercive police questioning of suspects. *State v. Rettenberger*, 984 P.2d 1009, 1015-18 (Utah 1999). In *Rettenberger*, decided on a preponderance of the evidence standard, the court found a confession inadmissible when law enforcement officers used those psychological ploys—false claims of incriminating evidence and deliberate minimalization of the legal consequences of admitting incriminating conduct—with an especially vulnerable suspect over an extended time. 984 P.2d at 1021. As reflected in *Stone*, the Kansas courts should similarly assess the overall impact of those techniques in light of the suspect's personal characteristics in determining voluntariness.

Earlier this year, two other appellate courts held that inculpatory statements vulnerable suspects made to law enforcement officers should have been suppressed because interrogation techniques combining false representations about incriminating evidence with minimalization of any legal consequences for admitting circumstances amounting to criminal offenses rendered them involuntary. *Preston*, 751 F.3d at 1027-28; *People v. Thomas*, 22 N.Y.3d 629, 646, 985 N.Y.S.2d 193, 8 N.E.3d 308 (2014). As with

22

*Stone*, their reasoning is illustrative of the potential constitutional perils associated with interrogation techniques comparable to those deployed in this case.

In *Thomas*, the New York Court of Appeals found officers impermissibly induced Thomas to implicate himself in the death of his 4-month-old son. During a 9 1/2-hour interrogation conducted in two sessions, a detective told Thomas, among other things, either he or his wife was responsible for the child's head injuries, so they would have to bring her in for questioning if he didn't confess. But the detective also said the injuries appeared to be accidental and Thomas could go home after explaining what happened. At the end of the first segment of the interrogation, Thomas essentially agreed to take the fall for his wife because he believed she had done nothing to harm the child. Thomas continued to say he had not hurt the baby either. At that point, Thomas was sufficiently distraught that he was involuntarily committed to a psychiatric hospital for observation for 15 hours between the sessions.

In the second session, detectives told Thomas they needed to know how he hurt his son so physicians could properly treat the baby. The detectives, however, already had been informed the child could not recover. After Thomas offered that he had dropped the child onto his bed days earlier, the detectives insisted that version didn't match what the doctors said happened because the injury required significant force. The detectives told Thomas he was lying. And eventually at their insistence, he "demonstrate[d]" how he had handled his son by forcibly throwing a clipboard to the floor of the interrogation room—a demonstration captured on video. 22 N.Y.3d at 640. Throughout the interrogation, the detectives repeatedly assured Thomas that the child's injuries were accidental, suggesting the absence of any significant criminal liability.

After pointing out that not all police deception renders a suspect's inculpatory statements involuntary and the determination rests on a case-by-case analysis dependent on the particular psychological pressures brought to bear during the interrogation and the

suspect's vulnerability, the Court of Appeals found the tactics applied to Thomas to be impermissibly overbearing. 22 N.Y.3d at 642. That coercion deprived Thomas of his right against self-incrimination. 22 N.Y.3d at 642. The court found the deceptive tactics overcame Thomas' free will, rendering the confession constitutionally infirm regardless of its truth or falsity. 22 N.Y.3d at 644-45. Moreover, however, the circumstances also raised a very real possibility the confession might be false, a statutory ground supporting exclusion under New York law similar to K.S.A. 2013 Supp. 60-460(f)(2)(B). 22 N.Y.3d at 646.[2]

[2]The court addressed Thomas' confession on appeal from his murder conviction. The trial court had ruled the statement admissible. The Court of Appeals reversed the conviction based on the erroneous admission of the confession and remanded for a new trial. Under New York law, the State had the burden to show beyond a reasonable doubt that Thomas' statements to law enforcement officers were voluntary, 22 N.Y.3d at 641, a higher standard than Kansas requires. As with the *DiGiambattista* decision, the differing burden does not, however, diminish the reasoning of the New York Court of Appeals in finding the confession involuntary because of the interrogation tactics. Thomas was acquitted in a retrial in June 2014. At trial, he called medical experts who testified that the fatal swelling of his son's brain was the result of infection rather than physical trauma, contradicting the State's medical witnesses. See "Scenes of a Crime," MSNBC, June 25, 2014, www.msnbc.com/documentaries/scenes-crime-subject-adrian-thomas-found-not-guilty-retrial (accessed July 27, 2014). (A copy of the MSNBC article has been placed in the appellate court file.)

In *Preston*, the Ninth Circuit emphasized many of the same considerations. The court underscored the importance of assessing "'both the characteristics of the accused and the details of the interrogation'" in evaluating the totality of the circumstances. 751 F.3d at 1016 (quoting *Dickerson v. United States,* 530 U.S. 428, 434, 120 S. Ct. 2326, 147 L. Ed. 2d 405 [2000]). In that case, two law enforcement agents questioned Preston, an 18-year-old, about the alleged sexual molestation of a boy who lived next door to him in the Navajo Nation in Arizona. Preston had an IQ of 65 and was considered intellectually disabled—something that was obvious to the agents as they interviewed him. The questioning was noncustodial and lasted about 40 minutes.

24

The agents employed Reid-style interrogation techniques by refusing to acknowledge Preston's denial of wrongdoing, by falsely stating that numerous witnesses put him in the company of the boy about the time the alleged assault took place, and by suggesting if this happened only once that would show that Preston wasn't a "monster" who "'prey[s] on little kids,'" so they "could 'move on.'" They also told Preston they would be "'cool'" if he admitted "'something just a little bit happened.'" 751 F.3d at 1013. One of the officers later testified that they intended to minimize the consequences of a confession. 751 F.3d at 1013.

Preston continued to deny the assault but often answered questions with what the court characterized as confused and equivocal responses. The agents then asked Preston a series of questions about how or why he assaulted the boy, assuming as a given that the assault actually took place. Each question contained two options both of which were legally incriminating but one of which was plainly morally more reprehensible. For example, they asked: "'[I]s it something . . . where you forced the issue or is it something that he wanted?'" In response, Preston always agreed he acted in the less odious way. 751 F.3d at 1014. Based on the tenor of the interrogation and expert testimony introduced at the suppression hearing, the court concluded that because of his limited intellect, Preston likely failed to appreciate those questions logically included an implicit third choice— neither. 751 F.3d at 1024.

More broadly, the court pointed out the potentially deleterious impact of those sorts of interrogation techniques, including overstating evidence and subtle or implicit promises that a statement to limited or qualified conduct would have only marginal legal consequences or none at all. 751 F.3d at 1026-27. The court, in turn, found that Preston's pronounced intellectual disability substantially intensified that danger and compelled a determination of involuntariness. 751 F.3d at 1027-28.

While none of the cases we have discussed dictates the outcome here because each of them has particular facts different from what happened between Brixius and Fernandez and only *Stone* is controlling authority, they are all of a type. They show how the interrogation techniques Brixius applied to Fernandez have the potential to undermine free will through psychological ploys crafted to induce inculpatory statements with what amount to undue influences on some suspects in some circumstances.

*Final Analysis*

Here, the State argues for reversing the district court's ruling by analyzing each problematic aspect of the interrogation individually and suggesting none of them caused any material prejudice. But the Kansas Supreme Court has specifically rejected a divide-and-conquer approach to assessing the involuntariness of a confession. *State v. Stone*, 291 Kan. 13, 29, 237 P.3d 1229 (2010). As we have already said, the circumstances surrounding a confession must be analyzed collectively. *State v. Randolph*, 297 Kan. 320, 329, 334, 301 P.3d 300 (2013) (acknowledging *Stone* and reviewing totality of circumstances bearing on defendant's confession to find it voluntary). So while a specific component of an interrogation viewed in isolation might not render a suspect's statements involuntary, the overall impact of multiple potentially coercive techniques could. 297 Kan. at 334. The *Stone* court made that precise point:  Any one of the coercive aspects of the interrogation might not have led to the conclusion that Stone's statements were involuntary, but a review of all of them collectively required that result. 291 Kan. at 32-33.

This case fits the *Stone* model. The interrogation of Fernandez was tainted by several significant forms of coercion and overreaching. Any one of them alone might not have rendered Fernandez' statements involuntary and inadmissible, as the State argues. But that is not the correct way of looking at the issue of voluntariness. When we review the overall character of the interrogation, we arrive at the same legal conclusion as the

district court. The manner of the interrogation produced statements from Fernandez that owed more to Brixius' false representations of evidence and his concerted efforts to minimize the consequences of the admissions he sought than to an exercise of a free, uncoerced will. The communication gap resulting from the poor translation and Fernandez' below average intellect only enhanced the pernicious effects of those tactics. Accordingly, the district court properly granted the motion to suppress on the grounds Brixius' interrogation of Fernandez produced involuntary statements inadmissible as evidence in this case.

Affirmed.