NOT DESIGNATED FOR PUBLICATION

No. 117,981

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

MARLA J. CRIQUI,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed February 16, 2018. Affirmed.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt,* attorney general, for appellant.

*Sam S. Kepfield,* of Hutchinson, for appellee.

Before LEBEN, P.J., HILL, J., and WALKER, S.J.

LEBEN, J.: This case returns to us for a second time. At issue is whether Marla Criqui's confession that she engaged in an illegal sexual relationship with a prison inmate can be admitted against her in a criminal trial.

Criqui made two arguments against its admissibility in the district court: (1) that investigators had violated her *Miranda* rights and (2) that her statements weren't voluntarily made. Either argument, if successful, would keep her confession from being used against her.

The district court's initial ruling was that the confession was inadmissible because her *Miranda* rights had been violated. But in the first appeal, we agreed with the State that Criqui was not in custody for *Miranda* purposes, so *Miranda* warnings weren't required. *State v. Criqui*, No. 114,940, 2016 WL 7186499, at *7 (Kan. App. 2016), *rev. denied* 306 Kan. 1322 (2017). We sent the case back to the district court for its consideration of Criqui's other argument since that court had not addressed it in the initial ruling.

The district court then concluded that the State had not met its burden to show that Criqui made the statements voluntarily. The State again appealed to our court.

The district court noted that the State had the burden to show that the statements were voluntary, and the court found that the State hadn't met that burden based on the court's overall review of Criqui's situation. We have once again carefully reviewed the evidentiary record and the district court's ruling. Based on the factual findings made by the district court, we agree that the State failed to meet its burden to show that the Criqui made the statements voluntarily. We therefore affirm the district court's ruling.

FACTUAL AND PROCEDURAL BACKGROUND

The parties presented their evidence to the district court before we first heard this case in 2016. No new evidence was presented when the district court considered the voluntariness issue on remand. So we begin with the summary of the evidence we provided in our 2016 opinion:

> "Marla Criqui worked at the Hutchinson Correctional Facility for 6 years. She was an employee of a food-service company that had a contract with the Kansas Department of Corrections to provide meals at the prison.

2

"Sometime around June 2012, the Intelligence & Investigation office at the prison received anonymous letters accusing Criqui of having a sexual relationship with an inmate. When investigating allegations of misconduct, agents in that office typically interview both the person accused of the misconduct and the inmate allegedly involved. Agents usually conduct interviews of employees in the Intelligence & Investigation office in the prison.

"On June 15, 2012, Criqui received a call while at work instructing her to go to the Intelligence & Investigation office at the prison's Central Unit. She was not told she was free to refuse that request. She drove to the Central Unit and passed through security to get to the Intelligence & Investigation office, located on the second floor.

"Agents John Marcus and Mark Mora conducted the interview in a conference room. The doors were closed but not locked. The agents were not armed. Criqui was not handcuffed or physically restrained. Both agents said Criqui was interviewed as a suspect, but Mora testified that he never told Criqui that she was free to leave or that she could stop the questioning. Neither agent read Criqui her *Miranda* rights before interviewing her.

"Marcus said the interview took about 10 minutes, while Mora estimated it was between 10 and 20 minutes. Criqui estimated that it took 1 hour. The district court did not make a factual finding about the interview's duration.

"According to the agents, at the beginning of the interview, Marcus told Criqui that they had been videotaping the area where she worked. The agents also placed DVDs on the table 'as a prop' to give Criqui the impression that they had recordings. But this was not true: they had not been recording the area and had no videos. Marcus acknowledged that this had been a ruse to get Criqui to speak and testified that such deception sometimes 'speeds up the process.' Marcus testified that he never specifically said that they had footage of Criqui or that they had observed her doing anything.

"According to Criqui, the agents told her that they had received reports of a relationship between her and an inmate. Criqui claimed that the agents had then '[thrown] a CD down on the table and said it was all recorded' and told her they had all the

3

evidence they needed to have her removed from the building. She also testified that the agents had warned her that if other inmates knew she had had sex with another inmate, she would be in danger of them 'get[ting] to [her].' Criqui testified that she knew and understood that once an employee is compromised, he or she is in danger of being taken advantage of by other inmates.

"In response to the agents' statements, Criqui admitted to having had sexual intercourse with an inmate. She was then escorted out of the facility by one of the agents. The agents took her keys to the facility, her radio, and her work documents. She was allowed to keep her identification card but was barred from reentering the prison." *Criqui*, 2016 WL 7186499, at *1-2.

Since the court was now deciding the voluntariness issue, not whether Criqui was in custody for *Miranda* purposes, the court made some additional factual findings on remand. Among those findings:

- The investigators' interview of Criqui took "not more than" an hour.
- Criqui had no cell phone with her because cell phones aren't allowed at the prison.
- The interview presumably took place during daytime work hours, but Criqui had been at work since 3 a.m.
- Criqui "was on the premises where she was required to be for her employment" and "had no choice but to appear at the [Intelligence and Investigation] office if she wanted to keep her job."
- Although the door to the interview room wasn't locked, "there is no indication [Criqui] knew the door wasn't locked."
- Criqui "had no ability to communicate with the outside world during the interview."

The court held Criqui's statements weren't voluntary. In support of its conclusion, the court cited "the manner of the interview, the inability of the defendant to

communicate with the outside world[,] and the fairness of the officers in conducting the investigation," as well as the court's review of the "totality of the circumstances."

The State once again appealed to our court. And even though the district court's ruling wasn't a final judgment (like dismissal of the charge), which normally triggers the right to appeal, a statute allows the State to appeal a district court order suppressing a confession or admission. See K.S.A. 2017 Supp. 22-3603.

ANALYSIS

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any [c]riminal [c]ase to be a witness against himself," a mandate applied to the states through the Fourteenth Amendment's Due Process Clause. See *Mallory v. Hogan*, 378 U.S. 1, 3, 84 S. Ct. 1489, 12 L. Ed. 653 (1964); *State v. Turner*, 300 Kan. 662, 676, 333 P.3d 155 (2014). The government is "constitutionally compelled to establish guilt by evidence independently and freely secured, and may not [by] coercion prove a charge against an accused out of his own mouth." *Mallory*, 378 U.S. at 8. This guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." 378 U.S. at 8.

When the defendant in a criminal case claims that a confession wasn't voluntary, the prosecution has the burden to prove that, more likely than not, it was voluntary. *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013); *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 1076, 337 P.3d 691 (2014). As for the substantive standard courts should apply, the United States Supreme Court and the Kansas Supreme Court say that we are to consider "the totality of the circumstances" when evaluating whether a confession was voluntary. *Arizona v. Fulminante*, 499 U.S. 279, 286, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); *State v. Davis*, 306 Kan. 400, 417, 394 P.3d 817 (2017). To

5

help courts consider all the circumstances, the Kansas Supreme Court has offered a nonexclusive list of factors to think about:

> "'(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.'" 306 Kan. at 417.

In any given case, one factor may be more important than others—and some may not apply at all. The factors aren't weighed against one another. Instead, the court considers them—and anything else relevant in a particular case—collectively to determine whether a confession or statement was voluntarily made. *Davis*, 306 Kan. at 417.

We should note one way in which the issue before us this time differs from the one we addressed in the State's first appeal. Then, the question was whether Criqui was in custody for *Miranda* purposes. As we explained then, the *Miranda* "determination of custody depends on the *objective* circumstances of the interrogation, not the personal, subjective views of the officers or the person being questioned." *Criqui*, 2016 WL 7186499, at *4 (citing *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994). Here, as shown by some of the factors listed in the Kansas Supreme Court's test, like "the accused's mental condition" and "age, intellect, and background," some subjective matters are considered when determining the ultimate question—whether the defendant's will was overcome. See *Yarborough v. Alvarado*, 541 U.S. 652, 667-68, 124 S. Ct. 2140, 156 L. Ed. 2d 938 (2004); 2 LaFave, Israel, King & Kerr, Criminal Procedure § 6.2(c) (4th ed. 2017). Even so, there must still be some police conduct "causally related to the confession." *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

In addition to those legal rules about voluntariness, we should also review the rules that govern the appellate review of a case like this. A district court's ruling on a motion to suppress a confession involves questions of both fact and law. *State v. Garcia*, 297 Kan. 182, 186, 301 P.3d 658 (2013). We review the district court's factual findings to be sure they were supported by substantial evidence, but we must determine the proper legal conclusions to be drawn from those facts independently, with no required deference to the district court's conclusions. *State v. Dern*, 303 Kan. 384, 392, 362 P.3d 566 (2015). Substantial evidence means legal and relevant evidence that a reasonable person would find adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012); *State v. Walker*, 283 Kan. 587, 594-95, 153 P.3d 1257 (2007). Appellate courts do not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in the evidence. *Dern*, 303 Kan. at 392.

With those legal standards in mind, let's turn to their application here. The district court applied three of the nonexclusive factors mentioned by the Kansas Supreme Court as ones to consider: (1) the manner and duration of the interview; (2) Criqui's ability to communicate with the outside world; and (3) the fairness of the officers conducting the investigation. We will discuss each of these factors while keeping in mind that we must consider all the factors relevant to this case collectively, not in isolation.

*Manner and Duration of the Interview*

The district court found that the interview took no more than an hour, not especially long. Statements have been held voluntary in several cases with even longer interviews. E.g., *State v. Mattox*, 305 Kan. 1015, 1045-46, 390 P.3d 514 (2017) (finding statement voluntary when defendant was interviewed for three hours); *State v. Harris*, 293 Kan. 798, 809, 269 P.3d 820 (2012) (finding statement voluntary when defendant was held for three hours and then interviewed for 90 minutes); *State v. Brown*, 285 Kan. 261, 271-78, 173 P.3d 612 (2007) (finding statement voluntary even though defendant

7

was handcuffed to a small table in an interrogation room for 12 hours). So the duration of this interview—at least by itself—does not suggest coercion.

But the district court cited the manner of the interview as one factor in support of its conclusion that the State failed to show the confession was voluntary. Several facts found by the district court could support that conclusion:

- Criqui was told to go to the Intelligence & Investigation office, was not told she had any option to refuse that request, and believed that she had to go if she wanted to keep her job.
- Two agents interviewed Criqui in a closed conference room located on the second floor of the Intelligence & Investigation office, which itself was in the prison's Central Unit. Visitors must pass through security checks just to get there, and although the conference room's closed door was unlocked, there was no indication Criqui knew it wasn't locked.
- The agents treated Criqui as a suspect, and they quickly made accusatory statements against her (including false statements about evidence they said they had, which we will discuss again in a moment).

Of course, none of this necessarily turned the interview into a coercive one. Nor did these facts eliminate even a possibility that the State might prove Criqui's statements were voluntary. What we ultimately must assess, though, after considering all the circumstances, is the effect these factors had on Criqui that day.

*Whether Criqui Could Communicate with the Outside World*

The district court found that Criqui "had no ability to communicate with the outside world during the interview." From Criqui's viewpoint, that appears to have been the case. She didn't have a cell phone with her—for security reasons, you can't bring them

into the prison. She was in a room with two officers. An officer had closed the door behind her when she entered, and Criqui didn't know that the door wasn't locked.

The State argues that the Kansas Supreme Court has listed this factor as "the ability of the accused to communicate *on request* with the outside world." (Emphasis added.) *Garcia*, 297 Kan. at 188, (quoting *State v. Robinson*, 293 Kan. 1002, Syl. ¶ 7, 270 P.3d 1183 [2012]). As the State properly notes, no evidence suggests Criqui asked for a chance to call or talk to anyone outside the room during her interview.

The State is right that the inability to communicate with others is more significant when some request to do so has been refused. For example, in *Haynes v. Washington*, 373 U.S. 503, 514, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963), the United States Supreme Court held a confession involuntary when police had refused a man's repeated requests to call his wife and an attorney and conditioned letting him speak to others on his first confessing. Nothing like that happened here. This factor on its own is, as our Supreme court put it in a recent case, "unilluminating." *Mattox*, 305 Kan. at 1046.

But even when this factor doesn't directly apply because the defendant made no specific request to speak to someone outside the interview room, the defendant's understanding of the situation—including her ability to communicate with others—is still something we may consider. The list of factors is nonexclusive, so similar situations may still be considered. We do not confront an obviously coercive situation like that of *Haynes*, in which a defendant's request to speak to others was refused on the condition that the defendant first confess. And we recognize that it is to be expected that police will take some steps to limit the ability of potential witnesses to communicate with others during an investigation. *Mattox*, 305 Kan. at 1046.

Even so, we may still consider, as part of the overall circumstances, the district court's conclusion that Criqui had no immediate ability to communicate with people

9

outside the interview room. Imparting a sense of isolation can itself be coercive. *Fernandez-Torres*, 50 Kan. App. 2d at 1079. So while this factor, on its own, is not determinative, we will consider the district court's factual finding about Criqui's lack of access to others when we turn to our overall consideration of the circumstances.

*Fairness of the Officers*

Analysis of the third factor noted by the district court—the officers' fairness—is similar. The officers were deceptive. But there's no constitutional right for officers to be scrupulously honest during interrogations. See *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990). So while deception can in some cases have a coercive effect, see *Fernandez-Torres*, 50 Kan. App. 2d at 1080-92, deception alone usually isn't enough to show that a confession wasn't voluntary. See *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969); *State v. Harris*, 279 Kan. 163, 170, 105 P.3d 1258 (2005). What we must do is consider the false statements along with all the other evidence to determine whether the defendant's confession was voluntary. *State v. Morton*, 286 Kan. 632, Syl. ¶7, 186 P.3d 785 (2008).

What the officers falsely told Criqui here appears to have encouraged her to confess. They told her that they had been videotaping her work area and placed DVDs on the table to give her the impression that the DVDs were recordings of her movements. The agents expected that this would affect Criqui, noting in testimony that this sort of deception sometimes "speeds up the process."

*Considering All the Circumstances*

Ultimately, we are to consider all the circumstances—whether listed on the nonexclusive list of factors or not—and determine whether the State showed that Criqui made her statements voluntarily. The United States Supreme Court calls this a "totality of the circumstances" test, applied (with somewhat different factors) when determining whether a person's statement was voluntarily made, *Fulminante*, 499 U.S. at 286, when determining whether an officer has probable cause to arrest someone, *District of Columbia v. Wesby*, 583 U.S. ___, 2018 WL 491521, at *6 (January 22, 2018), and whether an officer has reasonable suspicion to detain someone for further investigation. *Navarette v. California*, 572 U.S. ___, 134 S. Ct. 1683, 1687, 188 L. Ed. 2d 680 (2014). Under this test, a court must consider "the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), recognizing "that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Wesby*, 2018 WL 491521, at *9.

As we consider the whole picture, we must keep in mind the district court's factual findings and the burden of proof, which was on the State. Criqui's employer summoned her to meet with investigators when she had been at work since 3 a.m. The meeting was in a closed conference room in a secured building within a prison facility. Although she didn't ask to be able to call anyone, she had no cell phone and no readily available means of communication with anyone other than the investigators. She believed she had to meet with them to keep her job. They then led her to believe they already had video evidence against her when none existed. And the investigators told her—accurately—that if she had had an affair with an inmate, her safety in the prison had been compromised.

When no party asks the district court additional factual findings, we normally presume that it found the essential facts necessary to support its ruling. See *McIntyre v. State*, 305 Kan. 616, 618, 385 P.3d 930 (2016). In addition to the facts specifically

11

mentioned by the district court, additional evidence also supports its overall conclusion. One of the agents who interviewed Criqui testified that she "was crying" and "upset" when she confessed. And she testified that she was "very scared," believed she wouldn't be allowed to leave unless she confessed, and felt the agents were "intimidating" and "scary." In the conference room, she said that one of the agents was in front of her while the other "was wandering around behind me."

Considering the whole picture, we agree with the district court that the State did not meet its burden to prove that Criqui made the statements voluntarily. The district court's suppression ruling is affirmed.