No. 55,505

State of Kansas, *Appellee,* v. Andrew T. Dubish, *Appellant.*

(675 P.2d 877)

Opinion filed January 13, 1984.

*Don W. Lill,* of Emporia, argued the cause and was on the brief for the appellant.

*Rodney H. Symmonds,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

LOCKETT, J.: Andrew T. Dubish was convicted of aggravated kidnapping (K.S.A. 21-3421), aggravated sodomy (K.S.A. 21-3506), aggravated battery (K.S.A. 21-3414), and of making a terroristic threat (K.S.A. 21-3419). He appeals from these convictions.

The defendant, Andrew Dubish, and Mildred L. Dubish had been married for twenty years and had two sons, Chris and Darren. The Dubishes separated on July 30, 1982. Mrs. Dubish filed for divorce on August 2, 1982. The divorce hearing was held September 17, 1982, but the journal entry granting Mrs. Dubish a divorce was not filed with the clerk of the court until October 15, 1982.

On October 4, 1982, Darren was celebrating his seventh birthday. The defendant arranged with Mrs. Dubish to spend time with his sons to celebrate Darren's birthday. On October 4, 1982, Mr. Dubish picked up Chris and Darren at Mrs. Dubish's residence at 1233 Thompson Street in Emporia. The defendant had agreed to return the children at 10:00 p.m. that evening. When the defendant returned to the residence at 10:00 p.m., Mrs. Dubish was not there. Chris, then age 15, informed his father that his mother was in the process of moving. Mr. Dubish, with the two boys in the vehicle, drove to the new residence. Finding no one there, he headed back toward the Thompson Street residence. On the return trip, the defendant and Mrs. Dubish passed each other. Mrs. Dubish turned her car around and followed the defendant to 1233 Thompson Street. Tom Thomsen, a friend of Mrs. Dubish, was following her in his car. Thomsen also turned and went to Mrs. Dubish's residence.

The defendant, upon arriving, parked in the driveway of the

house. Mrs. Dubish also pulled into the driveway, and Mr. Thomsen parked across the street. The defendant saw Mr. Thomsen's car and asked Mrs. Dubish if that was her lover. Then the defendant walked across the street and told Thomsen if he "fucked with her [Mrs. Dubish], I would plant him." The defendant walked back across and Mr. Thomsen drove off.

While the defendant had been across the street talking to Thomsen, Mrs. Dubish had parked her car in the street in front of her house. The defendant walked to the car and said he wanted to talk with her. Mrs. Dubish said they could speak there. The defendant stated he did not want to speak with her there. Mrs. Dubish attempted to back her car into the driveway. The defendant reached into the car and pulled the keys out of the ignition, but the car continued running. The defendant opened the car door and jerked Mrs. Dubish from the car by her hair. The defendant gave the car keys to Chris and told him to put the car in the garage. Chris got into the car and drove off. Chris later returned home and telephoned the police. The defendant kept stating he wished to speak with Mrs. Dubish, but she did not want to speak with him. The defendant dragged Mrs. Dubish to his pickup truck and shoved her into the truck. Mr. Dubish then ordered Darren into the truck and drove off with Mrs. Dubish and Darren in the truck.

The defendant drove north at a very fast rate. While driving, the defendant struck Mrs. Dubish in the face chipping one of her front teeth. Mrs. Dubish tried to jump out of the truck but was restrained by the defendant. The defendant drove north on Highway 99, turned off Highway 99 onto a gravel road and stopped near a pond. There Mr. Dubish threatened to throw Mrs. Dubish into the pond, stating that the pond was 30 feet deep. Because she could not swim, Mrs. Dubish was terrified. The defendant told Darren to lie down in the front seat. Mr. Dubish got out of the truck pulling Mrs. Dubish out with him. The defendant struck Mrs. Dubish numerous times in the face, stomach and back. He pulled her hair, kicked her and beat her until she fell to the ground. The defendant stated he hated her and wanted to kill her. He took her to the back of the truck, unzipped his pants and ordered Mrs. Dubish to perform oral sex. She told the defendant she did not want to, but he told her to do it. At the trial Mrs. Dubish testified she performed oral sex

because she had been beaten and was frightened. After Mrs. Dubish had performed oral sex with the defendant, the defendant unzipped and pulled down Mrs. Dubish's pants and then beat her again. Mrs. Dubish could not remember precisely what occurred at this point in time.

After the beatings of Mrs. Dubish by the defendant had ended, the defendant retrieved a mirror from the truck and forced Mrs. Dubish to look into the mirror. He threatened to send two men to Mrs. Dubish's house to harm her if she called the police. Then the defendant drove off in his pickup truck leaving Mrs. Dubish lying in a ditch beside the road. The defendant soon returned to the scene but was unable to locate Mrs. Dubish, who was hiding. After the defendant left the second time, Mrs. Dubish rested, then got up and ran barefoot to a residence about a mile away. A Lyon County ambulance was called and took Mrs. Dubish to a hospital. At approximately 2:30 a.m. on October 5, 1982, Dr. Ginavan examined the victim at the hospital.

Mrs. Dubish stayed in the hospital until October 10, 1982. She was required to return to the hospital within an hour because of a urinary infection. Mrs. Dubish was released from the hospital on October 12, 1982.

A jury trial began on January 19, 1983, and ended January 26, 1983. During the trial Dr. Ginavan testified:

"She [Mrs. Dubish] had marked swelling and bruising of the left cheek area. There was also swelling of the right cheek area. There were multiple bruises of both arms and legs and upper chest and the left scapular area of the left back, and there were red linear discolorations of the neck and reddened area in the upper abdomen. Her — the white part of her left eye was hemorrhagic.

"Q. Now, what does that mean?

"A. The white part had blood in it, was red. There was tenderness of the right skull, posterior skull area. She had a quarter of an inch laceration of the forehead, and she complained of pain in the left chest and left elbow."

The defendant was convicted of aggravated kidnapping, aggravated sodomy, aggravated battery and of making terroristic threats. Mr. Dubish was sentenced to a life term of imprisonment for the aggravated kidnapping, not less than five years nor more than twenty for the aggravated sodomy, not less than three years nor more than ten years for the aggravated battery, and not less than one year nor more than two years for the terroristic threat.

The defendant argues first that he cannot be convicted of aggravated sodomy because he was still married to the victim at

the time the alleged offense occurred; that K.S.A. 21-3505 does not permit a husband to be convicted of committing the crime of sodomy or aggravated sodomy against his wife.

K.S.A. 21-3506 provides:

"Aggravated sodomy is sodomy committed:
"(*a*) With force or threat of force, or where bodily harm is inflicted on the victim during the commission of the crime."

K.S.A. 21-3505 provides:

"Sodomy is oral or anal copulation between persons who are not husband and wife or consenting adult members of the opposite sex."

Penal statutes must be strictly construed in favor of the persons sought to be subjected to them. The rule of strict construction simply means ordinary words are to be given their ordinary meaning. The statute should not be read to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it. *State v. Martin*, 232 Kan. 778, 781, 658 P.2d 1024 (1983).

The question is whether a husband can be convicted for the sodomy of his wife. The State construes K.S.A. 21-3505 as meaning one may be convicted of sodomy if either the sodomy occurs between persons not husband or wife *or* if one adult member of the opposite sex does *not consent*. This would not seem to be a reasonable construction of the statute. Ascribing the statute's words their ordinary meaning, (1) a husband and wife cannot be convicted of sodomy for activities between them, and (2) neither can consenting members of the opposite sex. Prior to July 1, 1983, married couples and consenting adult members of the opposite sex were the two types of couples which could not be prosecuted for sodomy. This court recognized in *State v. Chears*, 231 Kan. 161, 163, 643 P.2d 154 (1982), that the State had to prove the victim was (1) a nonconsenting adult, and (2) not the wife of the defendant before the crime of aggravated sodomy could be proven.

The new sodomy statutes passed by the 1983 legislature became effective on July 1, 1983, adding credence to the defendant's construction of the statutes in force on October 4, 1982. These new statutes read:

"(1) Criminal sodomy is sodomy between persons who are members of the same sex or between a person and an animal." K.S.A. 1983 Supp. 21-3505.
"Aggravated criminal sodomy is:

. . . .
"(*c*) sodomy with a person who does not consent to the sodomy or causing a person, without the person's consent, to engage in sodomy with any person or an animal, under any of the following circumstances:
"(*i*) When the victim is overcome by force or fear." K.S.A. 1983 Supp. 21-3506.

A spouse may be prosecuted for the commission of aggravated criminal sodomy against his or her spouse pursuant to the new statutes. The specific reference to husbands and wives originally contained in K.S.A. 21-3505 was omitted. In determining the legislative intent for the purpose of statutory construction, the historical background and changes made in a statute are to be considered by the court; any changes and additions made in existing legislation raises a presumption that a change in meaning and effect was intended. *State ex rel. Stephan v. U.S.D. No. 428*, 231 Kan. 579, 647 P.2d 329 (1982). One of the members of the 1983 House Judiciary Committee in committee hearings stated the major issue regarding the bill amending K.S.A. Chapter 21, Article 35, was whether spouses would have immunity from prosecution for sexual offenses. An earlier version of the new K.S.A. 21-3506 contained similar wording to the old 21-3505. The committee voted to remove all spousal immunity from the bill and the wording granting spousal immunity was abandoned. See K.S.A. 21-3502 and K.S.A. 1983 Supp. 21-3502.

A statute should never be given construction that leads to uncertainty, injustice or confusion, if possible to construe it otherwise. In construing a statute, words and phrases should be construed according to context and the approved usage of the language, and words in common use are to be given their natural and ordinary meaning. *Coe v. Security National Ins. Co.*, 228 Kan. 624, 620 P.2d 1108 (1980). The State's construction of the statute is strained and incorrect.

Were the defendant and the victim still married when the alleged crimes took place on October 4, 1982? That question requires a determination of when the divorce between the parties took effect.

The defendant and the victim separated on July 30, 1982. On September 17, 1982, a hearing was conducted by the district court concerning the divorce action filed by the victim in August of 1982. Both parties were present at the hearing. The trial judge granted the divorce and noted the granting of the divorce in his trial docket. The court directed the victim's attorney to prepare a journal entry. The journal entry was filed on October 15, 1982.

The State cites in *In re Estate of Penn,* 216 Kan. 153, 531 P.2d 133 (1975), in support of its argument that the divorce was effective on September 17, 1982. In *Penn,* the trial judge made a handwritten entry in his trial docket. The judge did not direct the preparation of a journal entry nor did he tell the clerk to enter the judgment in the appearance docket. The *Penn* court stated:

"The entry in his trial docket by a trial judge of minutes reflecting in the present tense a judgment of divorce rendered in open court is tantamount to a direction to the clerk that such judgment be entered forthwith." 216 Kan. 153, Syl. ¶ 4.

The clerk's entry in the appearance docket would be an effective entry of judgment. The court differentiated the judicial act of rendering a judgment and the ministerial act of recording the judgment rendered. *Penn* was decided under the prior statute, K.S.A. 60-258(*b*) (Corrick), which provided:

"*(b) What constitutes entry of judgment.* If judgment is to be entered on the verdict of a jury, or *by direction of the judge forthwith, the clerk shall make a notation of the judgment on the appearance docket* as provided by section 60-2601, and *such notation shall constitute the entry of judgment, and no journal entry or other document shall be required to render the judgment effective.* If the judge directs that the form of the judgment is to be settled by a journal entry or other document, it shall be prepared in accordance with the directions of the judge who shall then sign the same and cause it to be filed with the clerk. Such filing shall constitute the entry of the judgment, and it shall not be effective before such filing. The clerk shall forthwith note the filing of the journal entry on the appearance docket together with a brief abstract of the nature of the judgment." Emphasis supplied.

K.S.A. 60-258 was amended in 1976, and now provides:

"Entry of judgments shall be subject to the provisions of section 60-254(*b*). No judgment shall be effective unless and until a journal entry or judgment form is signed by the trial judge and filed with the clerk of the court. . . .

"When judgment is entered by judgment form the clerk shall serve a copy of the judgment form on all attorneys of record within three days. Service may be made personally or by mail. Failure of service of a copy of the judgment form shall not affect the validity of the judgment."

The new statute's language is clear. No judgment is effective unless and until a journal entry or judgment form is signed by the trial judge and filed with the clerk of the court. *In re Estate of Burns,* 227 Kan. 573, 575, 608 P.2d 942 (1980). In the recent case of *Anderson v. United Cab Co.,* 8 Kan. App. 2d 694, 666 P.2d 735, *rev. denied* September 8, 1983, the Court of Appeals found the

notation of the decision of the trial judge in his trial docket, and the notification of the decision to the attorneys by letter, was not in compliance with K.S.A. 60-258. The letter contained a direction to defendant's counsel to prepare a proper journal entry. The Court of Appeals held entry of judgment did not take place until the journal entry was filed. See also *Smith v. Smith,* 8 Kan. App. 2d 252, 655 P.2d 469 (1982).

The entry of judgment in this case occurred on October 15, 1982, when the journal entry was signed by the judge and filed with the clerk of the court. On October 4, 1982, the defendant and the victim were still married.

The defendant contends the trial court erred in overruling the defendant's motion to reduce the charge of aggravated battery to the charge of battery. The defendant argues the evidence did not establish that the victim suffered great bodily harm. The defendant's motion attacks the sufficiency of the evidence underlying the aggravated battery conviction. A motion attacking the sufficiency of the evidence is in reality no different than a motion for judgment of acquittal. *State v. Sanders,* 225 Kan. 147, 151, 587 P.2d 893 (1978). A trial court in passing on a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact therefrom, a reasonable mind, or rational trier of facts, might fairly conclude guilt beyond a reasonable doubt. *State v. Hill,* 233 Kan. 648, Syl. ¶ 3, 664 P.2d 840 (1983).

The crime of aggravated battery is defined by K.S.A. 21-3414:

"Aggravated battery is the unlawful touching or application of force to the person of another with intent to injure that person or another and which either:
"(a) Inflicts great bodily harm upon him; or
"(b) Causes any disfigurement or dismemberment to or of his person; or
"(c) Is done with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, dismemberment, or death can be inflicted."

Bodily harm has been defined as "any touching of the victim against [the victim's] will, with physical force, in an intentional hostile and aggravated manner." *State v. Taylor,* 217 Kan. 706, 714, 538 P.2d 1375 (1975). The word "great" distinguishes the bodily harm necessary in this offense from slight, trivial, minor or moderate harm, and as such it does not include mere bruises, which are likely to be sustained in simple battery. Whether the

injury or harm is great or not is generally a question of fact for the jury. *State v. Sanders,* 223 Kan. 550, 552, 575 P.2d 533 (1978).

The defendant requested an instruction defining "great bodily harm." The defendant claims the trial court's refusal to define great bodily harm in its instruction was error. The court's instruction followed PIK Crim. 2d 56.18.

The court in *State v. Sanders,* 223 Kan. at 552, noted K.S.A. 21-3414 is couched in language which is readily understandable, and there are no omissions of necessary language. See *State v. Kleber,* 2 Kan. App. 2d 115, 119, 575 P.2d 900, *rev. denied* 225 Kan. 846 (1978). The Pattern Instructions for Kansas - Criminal for aggravated battery does not include a definition of great bodily harm. See PIK Crim. 2d 56.18.

In charging the jury in a criminal case, it is the duty of the trial court to define the offense charged, stating to the jury the essential elements of the crime, either in the language of the statute or in appropriate and accurate language of the court. *State v. Nesmith,* 220 Kan. 146, Syl. ¶ 3, 551 P.2d 896 (1976); *State v. Lashley,* 233 Kan. 620, Syl. ¶ 6, 664 P.2d 1358 (1983). The instruction of the court follows the language of K.S.A. 21-3414 and adequately defines aggravated battery.

The defendant claims the trial court erred in not directing a verdict for the defendant on the charge of aggravated kidnapping. The motion is essentially a motion for judgment of acquittal and attacks the sufficiency of the evidence. See K.S.A. 22-3419; *State v. Sanders,* 225 Kan. at 151. The standard for ruling on such motions has been previously stated in this opinion.

The defendant argues he did not have the requisite intent for conviction for aggravated kidnapping. K.S.A. 21-3421 provides:

"Aggravated kidnapping is kidnapping, as defined in section 21-3420, when bodily harm is inflicted upon the person kidnapped."

K.S.A. 21-3420 provides:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person;

. . . .

"(b) To facilitate flight or the commission of any crime; or
"(c) To inflict bodily injury or to terrorize the victim or another."

The charge of aggravated kidnapping against the defendant followed the statutory language contained in section (c). K.S.A. 21-3201 states that except as provided by sections 21-3202, 21-3204 and 21-3405, a criminal intent is an essential element of

every crime defined by the Kansas Criminal Code. An element of aggravated kidnapping is the specific intent with which the taking or confining is done. *State v. McGee,* 224 Kan. 173, 177, 578 P.2d 269 (1978). One of the specific intents listed in K.S.A. 21-3420 must be proven before a person may be convicted of aggravated kidnapping. *State v. Brooks,* 222 Kan. 432, 434, 565 P.2d 241 (1977).

The defendant claims his only intent in shoving the victim into his truck and driving into the country was to have an uninterrupted conversation with the victim. He stated his desire to speak with the victim several times. The evidence belies the defendant's stated motive. Defendant claims he wished to speak with the victim in private, but was not willing to hold a conversation near the victim's car. The defendant became very angry, pulled the victim from her car by her hair, struck her, and dragged her to his truck. He hit the victim while driving and brutally beat the victim after he stopped the truck. During the beating, the defendant said he hated the victim and wanted to kill her. After stopping his vehicle, the defendant threatened to throw the victim into a 30-foot deep pond. The defendant was aware that Mrs. Dubish could not swim. Specific intent as an element of the crime charged is normally a question of fact for the jury and may be shown by acts, circumstances and inferences reasonably deducible therefrom and need not be established by direct proof. *State v. Stringfield,* 4 Kan. App. 2d 559, Syl. ¶ 2, 608 P.2d 1041, *rev. denied* 228 Kan. 807 (1980). The jury, when reviewing the evidence, found that the defendant abducted the victim with the specific intent to inflict bodily injury upon her or to terrorize her.

The defendant contends he cannot be convicted of aggravated kidnapping, aggravated sodomy, aggravated battery and terroristic threats because his conduct constituted one continuing act of force. In essence, defendant argues the four charges are multiplicitous. The defendant does not contest the aggravated kidnapping conviction under this issue, but claims the other three convictions are multiplicitous since he had been convicted of aggravated kidnapping. Since we have determined that the defendant and the victim were married, his conviction for aggravated sodomy was erroneous. The question is narrowed to whether under the facts of this case the defendant's convictions for aggravated battery and terroristic threat were multiplicitous.

The State claims the defendant did not raise the issue at the trial level and should not be allowed to raise the issue on appeal. Generally, an appellate court will consider only those issues presented to the trial court for determination. *State v. Puckett,* 230 Kan. 596, 598, 640 P.2d 1198 (1982). One of the exceptions to the general rule stated in *Puckett* is if consideration of the issue raised on appeal is necessary to serve the ends of justice or to prevent denial of fundamental rights. 230 Kan. at 598.

The issue of multiplicity was considered in *State v. Dorsey,* 224 Kan. 152, 578 P.2d 261 (1978). The court stated the principal danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense. 224 Kan. at 154-55. The fundamental right of a defendant to a fair trial under the 5th and 14th Amendments to the Constitution of the United States would be violated by a multiplicitous conviction.

The State may not split a single offense into separate parts. Where there is a single wrongful act it generally will not furnish the basis for more than one criminal prosecution. In *State v. Lassley,* 218 Kan. 758, 545 P.2d 383 (1976), we held that a single and continuing act of force could not form the basis for the crimes of aggravated assault and kidnapping. Lassley, armed with a knife, accosted a young woman in the home where she was baby-sitting. He ordered her outside, placed the knife at her throat, and subsequently took her to some nearby shrubs where she was raped. He was charged and convicted of kidnapping, aggravated assault and rape. This court stated:

"Both the kidnapping and rape charges required proof of the element of force. In each instance the force was supplied by evidence of the conduct of defendant in ordering the victim to do acts under the implied threat of harm. The fact defendant had a knife in his hand was significant in establishing the force element of both crimes. This same act of force cannot also provide the basis for the charge of aggravated assault. . . . The conduct of defendant in the instant case constitutes a single continuous transaction in which two separate and distinct offenses were committed. The act cited by the prosecution as constituting the offense of aggravated assault was part of the act of kidnapping and a prelude to the act of rape. In sum, this case presents a situation where there was a continuous act of force on the part of the defendant. The act which was relied on for the charges of rape and kidnapping cannot also be used to provide the basis of a separate offense. We hold therefore that the trial court erred in refusing to dismiss the charge of aggravated assault." 218 Kan. at 761-62.

In *State v. Racey,* 225 Kan. 404, 590 P.2d 1064 (1979), defendant Racey was convicted of kidnapping and aggravated assault. Racey continually threatened the victim of the kidnapping with a gun from the time the victim got into the car until the victim was rescued. This court found there was but one continuing act of force. The court set aside the conviction of aggravated assault. In *Lassley* and *Racey* the defendants continually threatened the victim by displaying a weapon; one continuing act of force was used as the basis for more than one conviction. But a single act may constitute two or more distinct and separate offenses, and a person charged with such act as two separate offenses may be convicted and punished for both. In *State v. Rueckert,* 221 Kan. 727, 561 P.2d 850 (1977), this court determined that when a homicide is committed in the course of an aggravated robbery, the offenses do not merge. The essence of aggravated robbery is to deprive a person or property, an element not found in homicide. Where offenses are committed separately and severally, at different times and at different places, they cannot be said to arise out of a single wrongful act. In *State v. James,* 216 Kan. 235, 531 P.2d 70 (1975), this court determined that an assault and battery, following which the victim broke away, does not merge with and is distinct from forcible rape, which occurred at a later time and at a different place. For additional discussion on multiplicity see *State v. Chears,* 231 Kan. at 162-63.

We will now review the facts of this case as they apply to the remaining convictions. Defendant was convicted of (1) aggravated kidnapping, (2) aggravated battery, and (3) terroristic threat. The aggravated kidnapping occurred at the victim's home. The defendant beat, pulled and dragged the victim to his pickup truck. After forcing the victim into the pickup truck, the defendant transported the victim to a pond. That act was separate and distinct from what occurred sometime later in a field near the pond.

After the pickup was stopped in a remote field near the pond, the defendant forcefully removed the victim from the vehicle. He again beat Mrs. Dubish, striking her in the face, stomach and back, pulled her hair and kicked her numerous times. After being beaten into submission, the victim was forced by the defendant to commit oral sex. The acts of hitting and kicking the victim

were sufficient for the jury to find the defendant guilty of aggravated battery.

Following the act of oral sex, the defendant again beat the victim. Just prior to abandoning the victim in the field, the defendant committed the act of terroristic threat. He retrieved a mirror from the pickup truck and forced the victim to look into the mirror. The defendant then threatened to send two men to the victim's house to harm her if she called the police.

Each offense was committed separately and severally, at different times. The aggravated kidnapping occurred at a separate place than the aggravated battery and the terroristic threat. The offenses cannot be said to arise out of a single wrongful act. The defendant's claim that the acts of aggravated kidnapping, aggravated battery, and terroristic threat constituted one continuing act of force is without merit.

The conviction and the sentence for aggravated sodomy as charged in count III of the information is set aside and the judgment is reversed to that extent; in all other respects the judgment is affirmed.