NOT DESIGNATED FOR PUBLICATION

No. 116,226

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CASEY L. BECKER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOHN J. KISNER JR., judge. Opinion filed November 22, 2017. Affirmed.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., GREEN, J, and MERYL D. WILSON, District Judge, assigned.

PER CURIAM: Casey L. Becker was convicted of one count of indecent liberties with a child. Becker appeals, arguing (1) that the trial court erred in admitting evidence of his prior sexual misconduct under K.S.A. 2016 Supp. 60-455(d); (2) that the trial court erred in denying his motion to suppress inculpatory statements that he made in the course of an interview with law enforcement; (3) that the trial court erred in excluding evidence of the victim's prior allegedly false accusations of sexual misconduct; and (4) that the doctrine of cumulative error affords him relief if none of the errors are sufficient on their own. Finding no error, we affirm.

1

In the spring of 2014, 14-year-old D.M.W., her two siblings, and her mother, J.A., moved in with the Becker family. J.A. was engaged to Curtis Becker. Curtis lived with his mother, Rinel Becker, and his brother, Casey Becker. The house was crowded, so Curtis and J.A. stayed in a bedroom in the basement. D.M.W. and Becker shared another room in the basement that was divided by a sheet. The sheet was hung up so that D.M.W. and Becker could maintain some kind of privacy. The only bathroom in the basement was located close to where D.M.W. slept.

In early May 2014, J.A. discovered inappropriate text messages on D.M.W.'s phone. The messages were of a sexual nature and had been sent to D.M.W. from a boy who lived in their neighborhood. J.A. and D.M.W. went to the boy's house and told his father what was happening. The boy's father told J.A. that it would not happen again.

J.A. and D.M.W. returned home, but J.A. was still angry. J.A. took some time to cool off before discussing the messages with D.M.W. J.A. asked D.M.W. what was going on and told her that she needed to be honest. D.M.W. was hesitant but eventually told her mother that Becker had been touching her. D.M.W. told J.A. that she did not talk about the inappropriate touching earlier because she did not want to negatively affect J.A.'s relationship with Curtis. J.A. called Curtis into the room where she and D.M.W. were discussing the abuse. D.M.W. explained to Curtis what had happened with Becker. J.A. decided that they needed to tell Becker's mother, Rinel, what had happened. Rinel works for the local police department. When they told Rinel that Becker had been touching D.M.W., Rinel called the police department and reported the incidents.

The police responded to Rinel's call and came to the Beckers' house. They kept Becker and the family separate as they asked questions and took pictures of the house. Eventually, the police officers asked that the family, including Becker, accompany them to the Missing and Exploited Children Unit at the police station. At the station, Becker was interviewed by Detective David Wertz. Wertz asked Becker for his side of the story.

2

Becker initially denied touching D.M.W.'s breasts intentionally. Instead, he told Wertz that he may have accidentally touched her breasts as he moved the blankets on the bed to make sure that D.M.W. was tucked in properly. Wertz told Becker that his story was unlikely. Becker eventually admitted that he had touched D.M.W.'s breasts on four or five occasions—though he claimed that the last time he touched her breasts was more than a month before the interview. Becker acknowledged that he would hear J.A. and Curtis having sex in the room next to his, which aroused him.

On May 23, 2014, Becker was charged with one count of indecent liberties with a child. The complaint/information filed against Becker alleged that on or about May 19, 2014, he engaged in lewd fondling or touching of a 14-year-old child, D.M.W., with the intent to arouse or satisfy sexual desires.

On January 28, 2016, Becker's bench trial began. At trial, D.M.W. testified that the night before the police were called, she was awoken by Becker touching her breasts. She testified that when she woke up, Becker ran into the bathroom and closed the door. Becker focused his defense on the fact that D.M.W. did not disclose the alleged touching until after J.A. discovered the inappropriate text messages on her phone. Becker argued that D.M.W.'s credibility should be questioned based on the peculiar timing of her disclosure—essentially arguing that D.M.W. made up the allegations against him to get out of trouble for the text messages. Finally, Becker argued that insufficient evidence existed to convict on the crime as charged. The State, on the other hand, argued that D.M.W. had hesitated in disclosing the alleged touching because she was worried about how it would affect the relationship between J.A. and Curtis. The State argued that Becker's admission that he had touched D.M.W.'s breasts about four or five times supported D.M.W.'s claim that he had done so on or about May 19, 2014, even though Becker claimed that he had not touched D.M.W. in more than a month.

3

After considering the evidence, the trial court found Becker guilty of indecent liberties with a child. The judge noted that he was not required to, but would in this case, go through his reasons for finding Becker guilty. The judge told the parties that the interview played a large part in his decision. Furthermore, the judge told the parties that he was "not terribly persuaded by the idea that [D.M.W.] was trying to cover something else or trying to get herself out of trouble." Finally, the judge found Becker's version of events—that the touching was accidental—as "very, very, very, very unlikely . . . close to impossible."

On May 4, 2016, Becker was sentenced to 32 months' imprisonment and lifetime postrelease supervision. Becker filed a timely notice of appeal. Additional facts will be introduced below.

*Did the trial court err in admitting evidence of Becker's prior sexual misconduct under K.S.A. 2016 Supp. 60-455(d)?*

Becker argues that the trial court erred in admitting evidence of his prior sexual misconduct under K.S.A. 2016 Supp. 60-455(d) because the "evidence was minimally probative and extremely prejudicial." Becker properly preserved this issue for appeal, as he contemporaneously objected to the evidence's introduction at trial.

"[E]vidence that a person committed a crime . . . on a specified occasion . . . is inadmissible to prove such person's disposition to commit crime . . . as the basis for an inference that the person committed another crime . . . on another specified occasion." K.S.A. 2016 Supp. 60-455(a). Stated more plainly, evidence of a criminal defendant's prior bad acts cannot generally be used to prove that the defendant has a propensity for committing other bad acts.

4

In the context of sex offenses, however, K.S.A. 2016 Supp. 60-455(d) provides an exception to the general prohibition on prior bad acts evidence. K.S.A. 2016 Supp. 60-455(d) states that "in a criminal action in which the defendant is accused of a sex offense . . . evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative." Thus, K.S.A. 2016 Supp. 60-455(d) allows the evidence to be used to show that the defendant has a propensity for committing sexual misconduct. See *State v. Bowen*, 299 Kan. 339, Syl. ¶ 7, 323 P.3d 853 (2014) ("As long as the evidence is of another act or offense of sexual misconduct and is relevant to propensity or any matter, it is admissible if the district court is satisfied that the evidence's probative value outweighs its potential for undue prejudice.").

Becker presents his argument in two stages. First, he argues that the evidence of his prior sexual misconduct was not relevant to the crime he was charged with. Second, he argues that the probative value of the evidence was outweighed by its prejudicial effect.

K.S.A. 60-401(b) states that evidence is relevant if it has "any tendency in reason to prove any material fact." Relevancy contains two elements: materiality and probativity. Evidence is material if the fact that it supports is in dispute and is significant under the substantive law applied in the case. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). This court exercises de novo review of the materiality of evidence. *State v. Page*, 303 Kan. 548, 550-51, 363 P.3d 391 (2015). "'Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion.' [Citation omitted.]" *McCormick*, 305 Kan. at 47. Appellate courts also review a trial court's determination that the probativity of evidence is, or is not, outweighed by its prejudicial effect for abuse of discretion. *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013). A judicial action constitutes an abuse of discretion: (1) if no reasonable person would take the view adopted by the trial court; (2) if it is based on an error of law;

or (3) if it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

In determining whether Becker's prior sexual misconduct was admissible under K.S.A. 2016 Supp. 60-455(d), we begin by considering whether the evidence is relevant—material and probative. Here, the evidence of Becker's prior sexual misconduct was offered to support the fact that he had committed the sexual misconduct that was charged in the present case. In its most simple form, then, the fact that the evidence was offered to support was that Becker had a propensity to touch D.M.W.'s breasts.

Our Supreme Court held in *Bowen*, 299 Kan. at 349, that "[i]n sex offense cases, propensity evidence is material, *i.e.*, has a 'legitimate and effective bearing' on defendants' guilt. [Citation omitted.]" Accordingly, the evidence of Becker's prior alleged sexual misconduct was material, and the trial court did not err in finding so.

We remember, however, that Becker's original explanation for any touching was that it would have been accidental as he was covering D.M.W. up with her blankets. Thus, Becker asserts that the State introduced the alleged prior sexual misconduct evidence to support the fact that he *intentionally* touched D.M.W.'s breast. He argues, however, that because the evidence of the alleged prior sexual misconduct was sparse, the State failed to show that the evidence supported that he had intentionally touched D.M.W.'s breasts in the past. Accordingly, Becker asserts that because the past sexual misconduct was accidental, it would not have any tendency to prove that he *intentionally* touched D.M.W. on or about May 19, 2014. Becker argues, in essence, that the distinction between accidental and intentional touching shows that the evidence is not probative, and, thus, not relevant.

Because Becker's trial was a bench trial, whether the touchings, past or present, were accidental or intentional was a question of fact to be considered and ruled upon by

6

the trial court. See *State v. Dubish*, 234 Kan. 708, 717, 675 P.2d 877 (1984) ("Specific intent as an element of the crime charged is normally a question of fact for the jury and may be shown by acts, circumstances and inferences reasonably deducible therefrom and need not be established by direct proof.") Thus, Becker's asserted distinction between the accidental and intentional touching has no bearing on whether the evidence of his prior sexual misconduct was admissible under K.S.A. 2016 Supp. 60-455(d). Instead, the distinction goes to the weight of the evidence and not its admissibility. See *State v. Winston*, 281 Kan. 1114, 1128, 135 P.3d 1072 (2006) (quoting 29 Am. Jur. 2d, Evidence § 309) ("Matters tending to reduce or enhance the apparent probative value of evidence affect only the weight of such evidence and not its admissibility.")

We acknowledge that the evidence of Becker's past sexual misconduct was not extremely developed or detailed. At trial, D.M.W. was unable to recall the dates of the past incidents or how many times the past incidents had occurred. She only testified that the incidents occurred "pretty regularly." But D.M.W. had only lived with Becker for three months prior to the charged crime occurring, so her inability to recall dates is not so troublesome. Furthermore, D.M.W. was able to testify that the prior sexual misconduct "happened the same way" that the charged sexual misconduct happened. Finally, Becker admitted to touching D.M.W.'s breasts four or five times when he was interviewed by Wertz.

Accordingly, the sparsity of detail in D.M.W.'s testimony is not fatal to the probativity of the evidence. And despite Becker's argument, similar evidence has been routinely admitted under 60-455(d) in the past. See *State v. Spear*, 297 Kan. 780, Syl. ¶ 2, 304 P.3d 1246 (2013) (K.S.A. 2012 Supp. 60-455[d] would permit admission of prior uncharged sex crimes against victim for the purpose of demonstrating defendant's propensity to commit charged sex crimes.); *Bowen*, 299 Kan. at 349 (Evidence of prior sex crimes was probative of defendant's propensity to commit acts alleged because prior crimes were sufficiently similar to allegations.); *State v. Gonzalez-Sandoval*, 53 Kan.

7

App. 2d 536, 573, 390 P.3d 84 (2017) (Alleged prior sexual misconduct was probative of defendant's propensity to commit current sex crime, even though the alleged prior sexual misconduct differed from the charged crime in some ways.)

Because the evidence of Becker's prior sexual misconduct was sufficiently similar—and actually identical—to the charged misconduct, it was highly probative of his propensity to commit the same crime. Accordingly, the trial court did not abuse its discretion in determining that the evidence was probative.

We have established that the disputed evidence was relevant under K.S.A. 60-401(b). Becker's alleged prior sexual misconduct was both material and probative. But, under K.S.A. 2016 Supp. 60-455(d), we still must determine whether the trial court abused its discretion in determining that the prejudicial effect of the evidence was outweighed by its probativity. *Lowrance*, 298 Kan. at 291. Our courts have recognized the following factors as useful in balancing the probative value of evidence with its potential for prejudice: "'1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence.' [Citations omitted.]" *Gonzalez-Sandoval*, 53 Kan. App. 2d at 574.

As was discussed before, D.M.W.'s testimony as to when the prior sexual misconduct occurred was not particularly detailed. Still, we know that the misconduct must have occurred sometime in the three months that D.M.W. and Becker lived in the same house. Furthermore, we know that the uncharged prior sexual misconduct was identical in nature to the charged sexual misconduct in this case. Thus, as we concluded before, it is highly probative. Under the third factor, Becker cannot seriously claim that the material fact is disputed, as he plainly admitted to touching D.M.W.'s breasts on four or five prior occasions. It should be noted that any evidence of past sexual misconduct has a prejudicial effect which will require the trial judge to weigh the probative value

versus the prejudice. Finally, we acknowledge that no less prejudicial evidence exists as it relates to Becker's alleged prior sexual misconduct. For those reasons, the trial court did not abuse its discretion in ruling that the probative value of the evidence of Becker's alleged prior sexual misconduct outweighed its potential for prejudice.

In conclusion, the trial court did not err in admitting evidence of Becker's prior sexual misconduct under K.S.A. 2016 Supp. 60-455(d). The evidence was material and probative, meaning that it was relevant under K.S.A. 60-401(b), and its probative value outweighed its potential for prejudice.

*Did the trial court err in denying Becker's motion to suppress the statements he made in his interview with Detective Wertz?*

On February 3, 2016, Becker filed a motion to suppress the interview conducted by Wertz. Becker argued that Wertz' questioning techniques caused him to make involuntary statements. The trial court found that despite Wertz suggesting certain possibilities to Becker during their interview, Wertz' methods were not excessively suggestive. The trial court further found that based on the totality of the circumstances, Becker's statements to Wertz were made freely, voluntarily, and of his own free will. Thus, the trial court denied Becker's motion to suppress.

Becker now argues that the trial court erred in denying his motion to suppress the statements that he made in his interview with Wertz. Becker specifically argues that his statements to Wertz were not voluntarily made "due to the highly suggestive and coercive interrogation techniques used by Detective Wertz."

Appellate courts employ a bifurcated standard of review when considering a trial court's decision on a motion to suppress. The appellate court will review the trial court's factual findings to determine whether they are supported by substantial competent

evidence. The trial court's legal conclusions, however, are reviewed by the appellate court under a de novo standard. In reviewing the trial court's factual findings, the appellate court will not reweigh the evidence or reassess the credibility of witnesses. *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014).

When a criminal defendant challenges the voluntariness of a statement made to law enforcement, the court will consider the totality of the circumstances surrounding the statement. The court will give particular consideration to the following list of nonexclusive factors: "(1) the accused's mental condition; (2) the manner and duration of the interview; (3) the accused's ability to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) the accused's fluency with the English language. [Citation omitted.]" *Gibson*, 299 Kan. at 214. The factors should not be weighed against one another; instead, a single factor or a combination of a few factors can lead this court to conclude under the totality of the circumstances that the accused's free will was overcome. 299 Kan. at 215 (quoting *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 [2013]).

Becker presents his argument relating to the voluntariness of his statements by comparing it to the factual scenario found in *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 337 P.3d 691 (2014). In *Fernandez-Torres*, the State sought interlocutory review of a trial court order suppressing inculpatory statements that the defendant, Fernandez, made to law enforcement officers investigating whether he had inappropriately touched his girlfriend's daughter. 50 Kan. App. 2d at 1070. The trial court found that "the circumstances of the interrogation rendered the statements involuntary, including problems with the Spanish-language translation, the officer's false representations about evidence supposedly implicating Fernandez, and the officer's poorly translated suggestion that some sort of momentary though improper touching of the girl could be dealt with." 50 Kan. App. 2d at 1070.

10

During Fernandez' interrogation, the police officer told him "that a doctor had found Fernandez' skin cells on [the victim's] vagina." 50 Kan. App. 2d at 1073. That evidence, however, did not actually exist. 50 Kan. App. 2d at 1081. The officer told Fernandez that the results of a medical examination of the victim showed that he must have touched the victim for a minute or two. The officer insisted that he already knew that Fernandez had inappropriately touched the victim—a point that the officer repeated throughout the interview. The officer also told Fernandez that he knew "Fernandez was not a bad person and 'what happened, in part, was a mistake.'" 50 Kan. App. 2d at 1073. The officer told Fernandez "that if he had the intention of touching [the victim] 'just for a second . . . that's okay and we can deal with that because you didn't do more.'" 50 Kan. App. 2d at 1073. The officer offered possible explanations for Fernandez' alleged actions and continuously rejected Fernandez' denials that he had touched the victim. 50 Kan. App. 2d at 1074.

In relation to the problems with the translation, two court certified translators testified as experts at Fernandez' suppression hearing. The experts testified that the translator at Fernandez' interrogation "sometimes translated incompletely or inaccurately the questions . . . posed and the answers Fernandez gave. In a few instances, [the translator] asked his own questions of Fernandez." 50 Kan. App. At 1072.

On appeal, a panel from this court considered the set of factors from *Gibson*. The panel noted that Fernandez was of "low average" intelligence and likely had some form of learning disability. 50 Kan. App. at 1080. In relation to the performance of the translator during Fernandez' interrogation, the panel noted that "[t]o be plain about it, [the translator] lacked the bilingual capacity and the training to function effectively as a translator in an extended interrogation about a sex crime against a child." 50 Kan. App. 2d at 1080. The panel also found that the translator's use of the Spanish word "negociar"—which translates to "deal with" in English—might have been "construed as a promise of lenient treatment or an outright deal, thereby affecting the truthfulness of any

11

inculpatory admissions on the theory a suspect might falsely confess if he or she understood no charges or only minor charges would result. [Citation omitted.]" 50 Kan. App. 2d at 1081. Additionally, the panel found that the police officer's statements throughout the interrogation "falsely minimized the legal consequences of the action[.]" 50 Kan. App. 2d at 1082. Thus, the panel found that:

> "[The officer's] interrogation approach effectively informed Fernandez both that the police had irrefutable scientific evidence that he had touched [the victim's] vagina and that if he had done so only for a second his actions were 'okay' and could be dealt with. The underlying message to Fernandez was this:  We have overwhelming evidence against you, but if you tell us you did it just briefly, nothing much will happen to you. [The officer] maneuvered Fernandez into a situation in which yielding to the suggestion would seem to carry a material benefit, though quite the reverse was true." 50 Kan. App. 2d at 1082.

In light of those problems, the panel held that the totality of the circumstances surrounding Fernandez' interrogation showed that his inculpatory statements were tainted by the interrogation procedures to the point that they were involuntary. Accordingly, the panel affirmed the trial court's decision to suppress Fernandez' statements. 50 Kan. App. 2d at 1083.

Here, Becker argues that "[j]ust as in *Fernandez-Torres* . . . Wertz' interrogation techniques were coercive and rendered [his] statement involuntary." Becker argues that Wertz continually rejected his account of what happened and pressured him to tell the truth. He further argues that "just as in *Fernandez-Torres* where the officer referred to the defendant's actions as 'a mistake,' Wertz appealed to [Becker] as 'a super nice guy' and downplayed the significance of his actions." Finally, Becker argues that Wertz implied that he could offer Becker leniency in exchange for the "truth." As we will see, though, the circumstances surrounding Becker's interrogation are not sufficiently similar to those in *Fernandez-Torres*.

12

Despite Becker's arguments, *Fernandez-Torres* is quite distinguishable from his case. First, we begin by noting the absence of a language barrier in relation to Becker. A review of the record shows that Becker was able to communicate with and understand Wertz. At times, Becker even asked clarifying questions when he did not understand. This is possibly the most glaring difference between our current case and *Fernandez-Torres*. Additionally, there is no indication in the record that Becker was of below average intelligence or suffered from a learning disability, as Fernandez did. In fact, Becker told Wertz that he had recently attended two semesters at a local community college.

Furthermore, contrary to Becker's claim that Wertz' actions implied leniency if Becker confessed to the crime, the record shows a different story. This is perhaps the most important, if not the most obvious, difference between this case and *Fernandez-Torres*. While Wertz did tell Becker that it would be good if his and D.M.W.'s stories were similar, he clearly communicated to Becker that there would be consequences for his actions. When Becker told Wertz that he was afraid of those consequences, Wertz was honest in telling Becker that based on his statements during the interrogation, he was going to jail. At that point, Becker requested legal counsel, and Wertz stopped the interrogation. By stopping the interrogation, Becker demonstrated that he understood his right to remain silent and that he had not been intimidated or coerced. The record does not support Becker's assertion that leniency would be a quid pro quo for telling the "truth." We remember that the court in *Fernandez-Torres* found particularly troubling the interrogator's repeated statements that he could "deal with" Fernandez' actions if they were only brief. The court held that Fernandez was in a place where yielding to the interrogator's demands would have seemed to provide a material benefit. Detective Wertz' actions and interrogation techniques put Becker in no such place and offered no such material benefit. Accordingly, Becker's assertion that Wertz impliedly offered leniency in exchange for inculpatory statements is not persuasive.

13

Finally, we note that Wertz did not ever expressly or impliedly tell Becker that he had any scientific evidence proving that Becker touched D.M.W. The court in *Fernandez-Torres* placed significant weight on the interrogator's false statement that he had irrefutable scientific evidence—skin cells on the victim's vagina—of Fernandez' guilt. Here, Wertz did not claim to have any evidence, scientific or otherwise, other than D.M.W.'s account of what occurred.

Based on those differences, we can confidently say that Wertz' actions and interview techniques were not akin to those of the interrogator in *Fernandez-Torres*. In fact, as we have discussed, they were strikingly dissimilar. And because they were not the same, Becker's comparison of Wertz' actions and those of the interrogator in *Fernandez-Torres* is misplaced. Having sufficiently distinguished *Fernandez-Torres*, we now look to the trial court's reasoning in its decision to deny Becker's motion to suppress.

The trial court listed and discussed the factors from *Gibson* in its decision on Becker's motion to suppress. Walking through those factors individually and reviewing Becker's videotaped interrogation we will see that they are each supported by substantial competent evidence.

First, the trial court found that there was "no dispute that the defendant's mental condition at the time of the interview was normal, the defendant's age, intellect and background is of no concern and that he was fluent in English." The record clearly reflects that this factual finding is supported by substantial competent evidence.

Next, the trial court found that: "The manner and duration of the interview was reasonable and did not raise any significant concerns. It was approximately 1 hour and 20 minutes, only the defendant and Wertz were in the room; Wertz was not armed; and there was no screaming or aggressive physical contact." Again, these factual findings are supported by substantial competent evidence.

14

The trial court also found that Becker "was not given any formal invitation to communicate with others outside the interview room but there was no request or any indication that the defendant made such request or desired such contact." We only add to the trial court's factual finding to note that Becker was in possession of his cell phone during the duration of the interview and up until he was arrested. In fact, Becker can be seen on video checking his cell phone during the interview when Wertz left the room. Thus, the trial court's factual findings are supported by substantial competent evidence.

Finally, the trial court found that although Wertz asked leading questions, "suggested" certain explanations for the alleged sexual misconduct, and expressed disbelief in Becker's explanations, "the detective's statements, actions and methods were not excessively suggestive, were considerate and were fair under applicable law and professional standards." Based on our analysis of *Fernandez-Torres*, and our comparison of Wertz' actions to those of the interrogator in *Fernandez-Torres*, we agree that the trial court's factual finding is supported by substantial competent evidence. Moreover, based on the same analysis and comparison this panel agrees that the trial court was also correct in finding that Wertz' actions and interview techniques adhered to applicable professional standards. If *Fernandez-Torres* draws the line for what will not be tolerated, Wertz' actions fall well short of that line.

Because the trial court's factual findings were supported by substantial competent evidence, and because Wertz' interview techniques were not similar to those of the interrogator in *Fernandez-Torres*, we hold that the trial court did not err in denying Becker's motion to suppress. The ultimate issue in our analysis is whether Becker's statements were the product of free and independent will—the totality of the circumstances show that they were. See *Fernandez-Torres*, 50 Kan. App. 2d 1069, Syl. ¶ 1.

*Did the trial court err in excluding evidence of D.M.W.'s prior accusations of sexual misconduct?*

Becker argues that the trial court erred in excluding evidence of D.M.W.'s prior false accusations of sexual misconduct, as the evidence was crucial to his theory of defense. Becker argues that had D.M.W. "made other false accusations of sexual misconduct, it stood to reason that she might make another."

A proper proffer of the substance of the evidence sought to be admitted is required for an appellate court to review a challenge to its exclusion. *State v. Garza*, 290 Kan. 1021, 1029, 236 P.3d 501 (2010). Becker made such a proffer. At trial, he proffered evidence consisting of D.M.W.'s statements made in an interview with a detective investigating Becker's alleged crime. The statements occurred on the night of May 19, 2014, when the family went to the Wichita Police Station. Becker argued that the evidence showed that D.M.W. told a detective that she, and two other family members, had been inappropriately touched by her grandmother's husband in Hoyt, Kansas. The incident had been previously reported to police by D.M.W.'s family members, but D.M.W.'s disclosure to the detective in the current case was the first time that she had reported that she was inappropriately touched by her grandmother's husband. Becker also argued that the evidence showed that D.M.W. disclosed for the first time at the interview that she had been inappropriately touched by her mother's ex-boyfriend. D.M.W. told the detective that both men had rubbed her leg, which made her feel uncomfortable. Becker proffered that he would call D.M.W., the detective who interviewed D.M.W., and her mother to testify on D.M.W.'s statements. Becker also proffered the video of the interview.

After reviewing the video of the interview and hearing arguments from the parties, the trial court ruled that the evidence was not admissible. The trial court made its ruling under the guidance of *State v. Barber*, 13 Kan. App. 2d 224, 766 P.2d 1288 (1989).

16

Accordingly, a discussion of *Barber* and its progeny is necessary for the resolution of this issue.

In *Barber*, the defendant, Barber, was convicted of indecent liberties with a child. A panel from this court was tasked with determining whether the trial court erred in excluding evidence of the victim's prior allegedly false accusations of sexual abuse. 13 Kan. App. 2d at 224. The victim had made three prior accusations, "[o]ne . . . against another person who was facing trial on a criminal charge for the incident at the time of Barber's trial. The other accusations, made in 1983, involved defendant and his brother." 13 Kan. App. 2d at 225. The trial court refused to permit the defendant to ask about the prior accusations. 13 Kan. App. 2d at 225.

On appeal, the panel first held that "[i]n sex offense cases, evidence of prior false accusations by the complaining witness is not evidence of prior sexual conduct as contemplated by the 'rape shield law.' [Citation omitted.]" *Barber*, 13 Kan. App. 2d 224, Syl. ¶ 1. Accordingly, the panel held that "evidence of prior false accusations of sexual abuse may be admissible to impeach the credibility of the complaining witness. [Citation omitted.]" 13 Kan. App. 2d at 226. The panel clarified its holding, however, and added "that a complaining witness's prior accusations are not always admissible. Such prior accusations are admissible only if a reasonable probability of falsity exists. The trial court must make the threshold determination of whether a reasonable probability of falsity exists." 13 Kan. App. 2d at 226. The panel acknowledged that its holding was a carve-out exception from the prohibitions on impermissible character evidence, as outlined in K.S.A. 60-422(d). The court held that:

> "[D]espite the restriction of 60-422(d), in a sex crime case, the victim/complaining
> witness may be cross-examined about prior false accusations, and if she denies making
> those accusations, the defendant may put on evidence of those accusations. However, the

17

prior accusations are admissible only after the trial court has made a threshold determination that a reasonable probability of falsity exists." 13 Kan. App. 2d at 227.

The holding from *Barber* has been consistently applied to situations where a defendant proffers evidence of a victim's prior allegedly false accusations of sexual misconduct. See *State v. Swint*, 302 Kan. 326, 355, 352 P.3d 1014 (2015); *State v. Prieto-Hernandez*, No. 109,696, 2014 WL 3731921 (Kan. App. 2014) (unpublished opinion); *State v. Williams*, No. 96,576, 2007 WL 4577862 (Kan. App. 2007) (unpublished opinion). Moreover, our Supreme Court has cited *Barber* with approval. See *State v. Matson*, 260 Kan. 366, 378-79, 921 P.2d 790 (1996) ("Because the trial court found there was no indication the complaining witness' prior allegations of abuse were false, the trial court did not abuse its discretion in excluding the evidence.")

Here, the trial court ruled that the prior allegedly false accusations were "not relevant to the issues in this case. Consideration of these allegations would be improper under K.S.A. 60-422 as they do not fit the definition of 'prior accusations' as described in or contemplated in *Barber*." The court also ruled that the "prior accusations" were not really "prior accusations" because they had been made at the same time that D.M.W. had accused Becker. The court further ruled that "there is no basis to find that reasonable probability of falsity exists as to the statements D.M.W. made[.]"

Acknowledging the trial court's bases for ruling that the evidence was inadmissible, but focusing on the threshold determination of falsity required under *Barber*, we will see that the trial court did not err in concluding that no reasonable probability of falsity existed. This court reviews a trial court's determination that no reasonable probability of falsity exists for an abuse of discretion. A trial court's action constitutes an abuse of judicial discretion:  (1) when no reasonable person would agree with the trial court's stance on an issue; (2) when it is based on an error of law; or (3) when it is based on an error of fact. *Marshall*, 303 Kan. at 445.

18

Becker, on the other hand, argues that our standard of review is de novo because the admissibility of the prior accusations evidence was dictated by constitutional law. His argument is based on the proposition that a criminal defendant has a right to present a full and complete defense. See *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). When a criminal defendant asserts that the trial court has unconstitutionally limited his or her right to present a chosen theory of defense, the appellate court reviews the issue de novo. *State v. Seacat*, 303 Kan. 622, 638, 366 P.3d 208 (2016).

But just as the defendant's confrontation and cross-examination rights bent to the trial court's threshold determination of probable falsity in *Barber*, so too must Becker's rights to present a complete defense. 13 Kan. App. 2d at 227. The determination of probable falsity must be made before the evidence would have any value affecting Becker's constitutional rights. For example, if we are to find that the trial court erred in excluding the evidence, then Becker's right to present a complete defense would be implicated. But if we are to find that the trial court did not err in excluding the evidence, then Becker's right to present a complete defense would not be implicated. Accordingly, we must first review the trial court's decision to exclude the evidence of D.M.W.'s prior alleged false accusations of sexual misconduct for an abuse of discretion.

During oral arguments on the issue at trial, Becker was asked by the trial court, "[W]hat basis do you have to believe that either of those [prior accusations] are false reports by her?" Becker answered, "I don't have information that says it was true. I don't have information that says it was false." Instead, Becker argued that the circumstances surrounding the prior accusations indicated their falsity. On appeal, Becker argues that the accusations are possibly false because D.M.W. waited so long to disclose them. Becker argues that that fact alone should have been sufficient to support the conclusion that the accusations were false.

In light of the record on appeal, we cannot say that a reasonable probability of falsity existed. We should be hesitant to accept Becker's assertion that the mere passage of time between the supposed misconduct and its eventual reporting would support a finding that a reasonable probability of falsity exists. Such a rule would not serve the spirit of *Barber*—to prevent impermissibly prejudicial evidence of a victim's prior allegations of sexual misconduct to be used to attack the victim's credibility and character. Becker himself admitted at trial that he had no evidence of the falsity of the prior accusations. This court can rely on that statement alone to hold that the trial court did not abuse its discretion in making its threshold determination that no reasonable probability of falsity existed.

For those reasons, we hold that the trial court did not abuse its discretion in making its determination that no reasonable probability of falsity regarding D.M.W.'s prior accusations of sexual misconduct existed.

*Does the doctrine of cumulative error require reversal of Becker's conviction?*

Becker argues that even if none of the asserted errors are sufficient on their own to warrant reversal, when considered cumulatively, they show that his conviction should be reversed.

The test under the cumulative error doctrine is whether the totality of the circumstances establishes that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). The doctrine of cumulative error cannot afford relief where no error or only one error exists. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

Here, no error has been found. Accordingly, Becker's argument that he is entitled to relief under the doctrine of cumulative error fails.

Affirmed.